# EXHIBIT 1

**FILED**

Insert name of court, branch court, if any, and mailing address

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** ........ **MARIN**

FOR COURT USE ONLY

**OCT 8 1982**

...TER MEYER

MARIN COUNTY CLERK

BY _____ DEPUTY

**PEOPLE OF THE STATE OF CALIFORNIA**

**DEFENDANT:**   FIKRI BAYRAMOGLU     [X] Present   [ ] Not Present

[ ] **JUDGMENT OF COMMITMENT TO:**   [X] STATE PRISON   [ ] COUNTY JAIL
[ ] **ORDER GRANTING PROBATION**   [X] **AND MINUTE ORDER**

CASE NUMBER   **8215**

| Date of hearing 10-5-82 | Dept. No FIVE | Judge E.W. MC GUIRE | Clerk S HAENGGI | Reporter L MILLER |
|---|---|---|---|---|
| Counsel for People PETE EVANS, DEPUTY DA | | Counsel for defendant MARK DAVIS, DEPUTY PD | | Probation Officer RICHARD HOWELL, DEPUTY PO |

1. Defendant was convicted of the commission of the following crime on (Date)

| Count | Code Section | Crime | Degree | By Jury, Court or Plea (Specify) |
|---|---|---|---|---|
| 1 | 187PC | MURDER | 2ND | JURY |

2. Defendant [ ] was arraigned [ ] waived arraignment for judgment

3. The court having read and considered the probation report and no legal cause having been shown why judgment should not be pronounced

  a. [X] Sentences defendant to State Prison for the term prescribed by law   **FIFTEEN YEARS TO LIFE**

  b. [ ] Specifies pursuant to Pen C 1202b the minimum term of imprisonment shall be six months as to count

  c. [ ] Sentences defendant to County Jail for the period of (Specify number of days)

  d. [ ] Suspends imposition of sentence and defendant is placed on probation for the period of
      [ ] upon conditions set forth in attachment 3d

4. [ ] Defendant convicted of more than one count shall

  a. [ ] serve the sentence as to each count as follows

| Count | Consecutive With | Concurrent With |
|---|---|---|

  b. [ ] serve the counts made consecutive in the following order

5. Defendant shall serve this sentence with respect to any prior uncompleted sentence   a. [ ] concurrently   b. [ ] consecutively
  c. [ ] as set forth below or in attachment 5c

6. Execution of sentence is

  a. [ ] stayed on the following count: _____ pending appeal, with the stay to become permanent
    when the sentence is completed as to count

  b. [ ] suspended and defendant is placed on probation for the period of
    [ ] upon conditions set forth in attachment 6b

7. [ ] No allegation to enhance punishment was made in count

8. [ ] It was alleged

  a. [ ] Defendant was armed with a deadly weapon at the time of the commission or attempted commission of the crime charged
    in count: _____   [ ] and allegation stricken as to count

**(Continued on reverse side)**

This form satisfies the requirements of Penal Code 1213.5 (Abstract of Judgment and Commitment) Singular includes the plural. This form is to be used in judgments other than death. A copy of probation report shall accompany this form pursuant to Penal Code 1203c, and a copy of any supplementary probation report shall be transmitted to the Department of Corrections. Attachments may be used but must be incorporated by reference.

Form Approved by the
Judicial Council of California
Effective July 1, 1976

**JUDGMENT-COMMITMENT**

Pen C 644 969c 969d 1203 1213.5
3024, 12022 12022.5

3110—24

b. [ ] Defendant used a firearm in count _____ [ ] and allegation stricken as to count _____
c. [ ] Defendant was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen C. 3024
   [ ] and allegation stricken.
d. [ ] Other (Specify and indicate if stricken)

9. [X] The Court finds the defendant
   a. [X] was armed at the time of commission or attempted commission of the crime with a deadly weapon within the meaning of
      (1). [ ] Pen C. 3024 as to count _____ [ ] but strikes the finding as to count: _____
      (2). [ ] Pen C. 12022 as to count _____ [ ] but strikes the finding as to count: _____
      (3). [X] Pen C. 1203 (Specify weapon) 1203.06(a)(1)PC -32 caliber revolver
         as to count 1 [ ] but strikes the finding as to count.
   b. [ ] was not armed at the time of commission or attempted commission of the crime within the meaning of.
      (1) [ ] Pen C. 3024 as to count _____
      (2) [ ] Pen C. 12022 as to count _____
      (3) [ ] Pen C. 1203 as to count _____
   c. [X] did use a firearm as to count 1 -12022.5PC [X] but strikes the finding as to count. 1
      (1) [ ] The use was one use for the following counts _____ The additional penalty shall
         run consecutively to the sentence on the last count to be served
   d. [ ] did not use a firearm as to count _____
   e. [ ] was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024 [ ] but strikes the finding
   f. [ ] was not armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024.
   g. [ ] Other (Specify and indicate if stricken)

10. [ ] Prior convictions which affect defendant's sentence were alleged and disposed of [ ] as follows [ ] as set forth in attachment 10

| Conviction date | Jurisdiction | Crime and Section | Applies to Count | Disposition |
|---|---|---|---|---|
|  |  |  |  |  |

11. The court finds defendant a [ ] is [ ] is not an habitual criminal Pen C. 644a
   b [ ] is [ ] is not an habitual criminal Pen C. 644b

12. The court pronounced sentence on (Date) 10-5-82 defendant was held in custody, through and including the date of pronouncement of sentence for (Total no. of days) 1,350 as follows

| Count | Time other than Dept. of Corrections | Dept. of Corrections Time |
|---|---|---|
| 1 | 1,350 |  |

13. Defendant is remanded to the custody of the Sheriff
   a. [ ] For the period of (Specify no. of days) _____ [ ] upon conditions and recommendations set forth in attachment 13a
   b. [X] To be delivered [X] at the earliest convenient time [ ] after _____ excluding Saturdays, Sundays and holidays [Pen C. 1203c] into the custody of the Director of Corrections at
      (1) [ ] California Institution for Women—Frontera      (3) [ ] California Institution for Men—Chino
      (2) [X] California Men's Facility—Vacaville      (4) [ ]
14. [ ] The court requests a copy of the diagnostic study and recommendations Pen C. 1168.
15. The court advised defendant of all appeal rights as required in CRC Rule 250 and acknowledges understanding them
16. [ ] Other (See attachment 16)

Dated. OCTOBER 7,1982                              E. _____
         (Type or print name)                     (Judge of the Superior Court)

TOTAL NO. of boxes checked _____

**CLERK'S CERTIFICATE**
I hereby certify that the foregoing _____ of the original on file in my office _____ of the superior Court

[Seal]

By _____ Deputy.

# EXHIBIT 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life  )
Term Parole Consideration  )          CDC Number C-54604
Hearing of:                )
                           )
FIKRI BAYRAMOGLU           )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 25, 2006


PANEL PRESENT:

James Davis, Presiding Commissioner
Noreen Blonien, Deputy Commissioner
Janice Eng, Commissioner, Observing

OTHERS PRESENT:

Peter Ferguson, Attorney for Inmate
Kathryn Mitchell, Deputy District Attorney, Marin
   County (Via Telephone Conference)
Brian Weigelt, Correctional Officer


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No          See Review of Hearing
_____   Yes         Transcript Memorandum


**C. M. Lopez, Northern California Court Reporters**

INDEX

                                                    Page

Proceedings...................................... 1

Case Factors..................................... 8

Pre-Commitment Factors........................... 11

Post-Commitment Factors.......................... 12

Parole Plans..................................... 16

Closing Statements............................... 18

Recess........................................... 28

Decision......................................... 29

Adjournment...................................... 35

Transcriber Certification........................ 36

--oOo--

1

1      **P R O C E E D I N G S**

2          **DEPUTY COMMISSIONER BLONIEN:**  We are on

3      record.

4          **PRESIDING COMMISSIONER DAVIS:**  All right.

5      This is a subsequent parole consideration hearing

6      for Fikri Bayramoglu.  Today's date is October

7      25th, 2006.  We are located at the Correctional

8      Training Facility at Soledad.  The inmate was

9      received on 10/12/82 from Marin County for murder

10     second, Case Number 8215, with a life term

11     beginning on 10/12/82, with a total term of 15

12     years to life and a minimum eligible parole date

13     of April 19th, 1990.  And the -- this hearing is

14     being tape recorded; so for purposes of voice

15     identification, we'll each state our first and

16     last name, spelling the last name.  I'll start

17     and move to my left; and,

18     Ms. Mitchell, we will have you read in last.

19     Well, I'll start with my left [verbatim].  I'm

20     James Davis,

21     D-a-v-i-s; Commissioner.

22          **DEPUTY COMMISSIONER BLONIEN:**  I'm Noreen

23     Blonien, B-l-o-n-i-e-n; I'm a Deputy

24     Commissioner.

25          **ATTORNEY FERGUSON:**  Peter Ferguson,

26     F-e-r-g-u-s-o-n; counsel for the inmate.

27          **COMMISSIONER ENG:**  Janice Eng, E-n-g;

1  Commissioner, observing.

2       **PRESIDING COMMISSIONER DAVIS:**  All right,

3  Ms. Mitchell, you are next.

4       **DEPUTY DISTRICT ATTORNEY MITCHELL:**  Yes.

5  Kathryn Mitchell, M-i-t-c-h-e-l-l; Marin County

6  District Attorney's Office.

7       **PRESIDING COMMISSIONER DAVIS:**  And for the

8  record, Ms. Mitchell joins us by telephone

9  conference at the request of the Board, and the

10  Marin County District Attorney's Office has made

11  an exceptional effort to be with us today to help

12  -- help us with some calendar issues.  So, Ms.

13  Mitchell, I want to officially recognize you for

14  that effort.  Thank you very much.

15       **DEPUTY DISTRICT ATTORNEY MITCHELL:**  You're

16  welcome.

17       **PRESIDING COMMISSIONER DAVIS:**  All right.

18  And the record should note also that Mr.

19  Bayramoglu is not here with us today by his own

20  choice, and we will have one of the correctional

21  officers here with us in a little bit to explain

22  that further, but it is something that he has

23  indicated by his own choice.  He does not wish to

24  be here.  And, Counsel, I believe you had some

25  contact with him as well?

26       **ATTORNEY FERGUSON:**  I did.  I was here at

27  the facility approximately a month ago for the

3

1   purpose of interviewing the inmate, and he

2   refused to meet with me.  He had corresponded

3   with me, though, on two different occasions and

4   indicated his desire not to attend today.

5            PRESIDING COMMISSIONER DAVIS:  All right.

6   Very well.  You have the letters in that regard?

7            ATTORNEY FERGUSON:  I do, but they're

8   actually conspicuously stamped as being

9   attorney/client confidential [inaudible]--

10           PRESIDING COMMISSIONER DAVIS:

11   [inaudible], yeah.  Okay.

12           ATTORNEY FERGUSON:  I can express to the

13   Board the essence of the letters though.

14           PRESIDING COMMISSIONER DAVIS:  All right,

15   very well.  Thank you.  And for the record, I

16   should repeat that on -- it's not dated,

17   unfortunately -- [inaudible] 1073 Form that it

18   indicates under Inmate's Signature, it says,

19   "Refused to sign"; but there are no disabilities

20   identified as being [inaudible] to the Americans

21   with Disabilities Act.  And, Counsel, in your

22   contact with the inmate, have you ever noticed

23   anything that might preclude him from either

24   being here at the hearing or making the

25   appropriate conscious decision not to attend?

26           ATTORNEY FERGUSON:  No, sir.

27           PRESIDING COMMISSIONER DAVIS:  Okay.  And

4

1    I know you're not a mental health professional by

2    any means, but -- I don't think you are.

3        **ATTORNEY FERGUSON:**  I do, actually, have a

4    background working in mental health.  But the

5    assessment of my communications with him is that

6    he is quite intelligent; but reading between the

7    lines, it seems as if he is, perhaps, a little --

8    not delusional, but his judgment, I would say, is

9    impaired in terms of how he's perceiving his

10    predicament and what he can do to enhance his

11    situation.

12        **PRESIDING COMMISSIONER DAVIS:**  [inaudible]

13    that this is a conscious choice on his part?

14        **INMATE BAYRAMOGLU:**  I do.

15        **PRESIDING COMMISSIONER DAVIS:**  All right,

16    thank you.  All right then, this hearing will be

17    conducted pursuant to Penal Code Sections 3041

18    and 3042 and the Rules and Regulations of the

19    Board of Prison Terms governing parole

20    consideration hearings for life inmates.  The

21    purpose of today's hearing is to, once again,

22    consider the number and nature of the crimes for

23    which the inmate was committed, his prior

24    criminal and social history, and his behavior and

25    programming since his commitment.  We have had

26    the opportunity to review his Central File and

27    his prior hearing transcripts, and he will be --

5

1    he would have been -- given an opportunity to

2    correct or clarify the record; however, he can do

3    that by written form when he receives his

4    transcript if he so chooses.  We will reach a

5    decision today and inform you whether or not we

6    find him suitable for parole and the reasons for

7    our decision.  If he is found suitable for

8    parole, the length of his confinement would be

9    explained to him.  Nothing that happens here

10   today would change the findings of the court.

11   The panel is not here to retry his case.  We are

12   here for the sole purpose of determining his

13   suitability for parole.  This hearing will be

14   conducted in effectively two phases.  First I

15   review the crimes for which he was committed, as

16   well as his prior criminal and social history.

17   Then Commissioner Blonien will review his

18   progress since his commitment, his counselor's

19   report, psychological evaluations, parole plans,

20   and any letters of support or opposition as they

21   may exist.  There will be no questioning, of

22   course, as Mr. -- the inmate -- is not here with

23   us.  The defense attorney will, of course, be

24   offered the opportunity for a final closing

25   statement as -- and then followed by that, the

26   District Attorney's final closing statement.  The

27   California Code of Regulations states that

6

1    regardless of time served, a life inmate shall be

2    found unsuitable for and denied parole if in the

3    judgment of the panel the inmate would pose an

4    unreasonable risk of danger to society if

5    released from prison.  The inmate has certain

6    rights.  Those rights include the right to a

7    timely notice of this hearing, the right to

8    review his Central File, and the right to present

9    relevant documents.  Counsel, are you satisfied

10   that your client's rights have been met today?

11         **ATTORNEY FERGUSON:**  Yes, sir.

12         **PRESIDING COMMISSIONER DAVIS:**  And he also

13   has an additional right to an impartial panel.

14   Counsel, are you satisfied that this panel can be

15   impartial?

16         **ATTORNEY FERGUSON:**  Yes, I am.

17         **PRESIDING COMMISSIONER DAVIS:**  He will

18   receive a written copy of our tentative Decision

19   today.  That decision becomes effective within

20   120 days, and a copy of the Decision and a copy

21   of the transcript will be sent to him.  Should he

22   have any concerns with that, the Board has

23   eliminated its appeals process, but he would have

24   the right to go directly to court with his

25   concern.  And just emphasizing, again this panel

26   does accept the findings of the court to be true.

27   Commissioner, are we going to be dealing with

7

1    anything from a confidential file today?

2            **DEPUTY COMMISSIONER BLONIEN:**  There is

3    information in the confidential file which we may

4    be using today.

5            **PRESIDING COMMISSIONER DAVIS:**  All right.

6    Should we use any of that confidential file in

7    our decision, that will be announced at the time

8    that the decision is rendered.  And I have passed

9    a checklist of documents to counsel here in the

10   room.  Does the District Attorney also have a

11   checklist at your end?

12           **DEPUTY DISTRICT ATTORNEY MITCHELL:**  Yes, I

13   do.

14           **PRESIDING COMMISSIONER DAVIS:**  All right,

15   very well.  And you're satisfied that you have

16   the appropriate documents to proceed today?

17           **ATTORNEY FERGUSON:**  I have a psychological

18   report.  The one that I have is dated 2002.  I

19   just wanted to make sure that there's not a more

20   current one that I haven't been provided with.

21           **PRESIDING COMMISSIONER DAVIS:**  I don't

22   believe so.  Commissioner, do you --

23           **DEPUTY COMMISSIONER BLONIEN:**  I don't have

24   one --

25           **PRESIDING COMMISSIONER DAVIS:**  I think

26   that is the latest.

27           **DEPUTY COMMISSIONER BLONIEN:**  I looked

8

1    through the file and --

2        **ATTORNEY FERGUSON:**  [inaudible] didn't

3    receive it, [inaudible].

4        **PRESIDING COMMISSIONER DAVIS:**  Are there

5    any additional documents, Counsel, you'd like to

6    present today?

7        **ATTORNEY FERGUSON:**  No, sir.

8        **PRESIDING COMMISSIONER DAVIS:**  Any

9    preliminary objections?

10       **ATTORNEY FERGUSON:**  Not at this time.

11       **PRESIDING COMMISSIONER DAVIS:**  Very well

12   then.  For a review of the crime, I'm going to be

13   referring to the Life Prisoner Evaluation dated

14   July 24th, 1995, where it states under Offense

15   Summary:

16               "On April 17th, 1980, at

17           approximately 9:15 p.m., police

18           officers responded to a call from

19           United Liquors on 4th Street in San

20           Rafael and observed Fikri Bayramoglu

21           lying on the floor of the store

22           covered in blood.  Bayramoglu told

23           the officers, quote, 'I killed my

24           girlfriend.  God, I killed my

25           girlfriend,' closed quotes.

26           Officers checked the surrounding

27           area and observed small spots of

9

1    blood which formed a path of travel

2    to 1565 4th Street.  The officers

3    followed the path of blood to

4    Apartment Number 7 and found the

5    door partially open.  The officers

6    looked inside and observed a white

7    female who was nude lying on her

8    back just inside the doorway.  The

9    officers could detect no signs of

10    life from the female who was later

11    identified as Tracy Lee Jones,

12    J-o-n-e-s.  The officers noted that

13    Jones had suffered several bullet

14    wounds to the upper chest portion of

15    her body.  The officers also

16    observed a wooden handled six-inch

17    knife on the floor near Jones' right

18    elbow.  The knife appeared to have

19    blood on it.  At about 9:30 p.m., an

20    ambulance left United Liquors, and

21    Bayramoglu was taken to the

22    emergency room at Marin General

23    Hospital.  A police officer was

24    assigned to accompany Bayramoglu to

25    the hospital, and he noted that the

26    suspect appeared to be suffering

27    from a puncture wound to the upper

1    chest area.  Other puncture wounds

2    were noted in the lower right side

3    of his abdomen, six wounds in all.

4    As the suspect was being placed in

5    the ambulance, he asked several

6    times, quote, 'What about Tracy?  Is

7    she dead?' closed quotes.  He then

8    stated, quote, 'I killed my

9    girlfriend.  Please let me die.  I

10   stabbed myself in the heart

11   [inaudible] die,' closed quotes.

12   The officer noted that Bayramoglu

13   pleaded with the attending

14   paramedics to let him die.  While at

15   the hospital, the suspect stated,

16   quote, 'Three times I shot her, so I

17   have two bullets to kill myself,'

18   closed quotes.  A few hours later

19   while still at Marin General

20   Hospital, Bayramoglu awoke and

21   stated to a San Rafael Fire

22   Department paramedic that he stabbed

23   himself and attempted to kill

24   himself by plunging a steak knife

25   into his chest in the area of his

26   heart and then he twisted the knife

27   around inside his body.  On April

11

1      17th, 1980, at approximately 11:40

2      p.m., San Rafael police officers

3      interviewed the suspect at the

4      intensive care unit of Ross General

5      Hospital.  The suspect stated, in

6      part, quote, 'I deserve to get

7      killed.  That's what I'm saying.

8      You are recording it.  Go ahead.  I

9      deserve to get killed off.  I killed

10     somebody.  I want to die with her.

11     I deserve to get killed.  That's all

12     there is to it,' closed quotes."

13     And the source document -- this was the

14     Probation Officer's Report dated 10/5 of 1982.

15     In terms of prior convictions, the prisoner has

16     no juvenile record, and the commitment offense is

17     the only adult conviction.  In terms of personal

18     factors, the prisoner was born in Istanbul,

19     Turkey, on December 12th, 1948.  His parents

20     remained united, and the prisoner is the third of

21     five children.  His father has worked all of his

22     life as a contractor, and his mother is a

23     housewife.  The prisoner described his childhood

24     as being normal and happy.  None of his family

25     members had ever been arrested.  The prisoner

26     attended school in Turkey until approximately the

27     age of 13 or 14, and then he went to work for his

12

1   father.  The prisoner was then drafted into the

2   Turkish army for two years.  After he discharged

3   from the army, he worked for a glass repair

4   company.  In addition to working for his father,

5   the prisoner also drove taxis during his spare

6   time.  In 1973, the prisoner immigrated to the

7   United States.  While in the United States, the

8   prisoner worked sporadically as a house painter.

9   The prisoner had never married.  After

10   immigrating to the United States, the prisoner

11   dated several women, but none of the

12   relationships could be described as serious.  The

13   prisoner then met and fell in love with Tracy Lee

14   Jones, and he lived with the victim for

15   approximately two years before the instant

16   offense.  The prisoner's overall health is good.

17   He does suffer from peptic ulcers which flare up

18   from time to time.  Due to his ulcers, he does

19   not consume much alcohol.  When he arrived in

20   Turkey -- or excuse me -- when he lived in Turkey

21   -- he did not use any illicit drugs.  After

22   moving to the United States, he started smoking

23   marijuana quite heavily.  Prior to the commitment

24   offense, the prisoner was suspected -- was

25   spending -- about forty dollars a day on

26   marijuana.  The prisoner had also smoked

27   marijuana on the day of the commitment offense.

13

1    He has not used any other illicit drugs other

2    than marijuana.  When the prisoner immigrated to

3    the United States, he converted from being a

4    Muslim to a Fundamentalist Christian.

5    Psychiatrist, Dr. Joseph Gutspadt [phonetic], G-

6    u-d-s-p-a-d- [inaudible], prepared a report for

7    the court dated 4/13/82 and stated that the

8    prisoner was described as being almost

9    [inaudible] in his devotion and in his obsessive

10   adherence to the Bible and his preoccupation with

11   it and, quote, The word of God,' closed quotes."

12   All right, Commissioner?  I turn this over to

13   you.

14            **DEPUTY COMMISSIONER BLONIEN:**  The inmate

15   last appeared before the Board on 9/16/2-0-2

16   [verbatim].  The decision was a four-year denial.

17   The panel recommended that the inmate become and

18   remain disciplinary free, upgrade vocationally

19   and educationally, and participate in self-help

20   and therapy.  This is his sixth subsequent

21   hearing.  The inmate [inaudible] this report or

22   review his C-File and updated the counselor's

23   report by Counselor Peabody dated 08/02 and the

24   psych report by Dr. Carswell, C-a-r-s-w-e-l-l,

25   dated 5/17/02.  The inmate's current custody

26   level is Medium A, and his Classification Score

27   is 19.  On 7/27/06, he was afforded the

14

1    opportunity to review his C-File and he declined

2    that opportunity.  Since his last hearing, he has

3    been unassigned from his PIA Textiles job on

4    8/7/02 and has no current work.  There is no --

5    not any chronos in the file as to any programs

6    that he's participated in.  He does have 13 115s.

7    The last one was prior to his last hearing, so he

8    has been disciplinary free since his last

9    hearing.  The last 115 was 6/12/02 for refusing

10   to report for work; and it was after that, and

11   reviewing his supervisor's chronos that showed

12   satisfactory to below-average work, that he was

13   reassigned from PIA [inaudible] on August 7th,

14   '02.  He also has 13 128s, and the last one was

15   on 6/20/02, for being hostile and argumentative.

16   And looking at his psych report, it should be

17   noted that Dr. Carswell, under Current Diagnostic

18   Impressions, gives No Clinical -- No Contributory

19   Clinical Disorders.  Under Axis II, he notes a

20   Personality Disorder, Not Otherwise Specified,

21   with Anti-Social Dependent and Grandiose

22   Features.  Under Axis III, No Contributory

23   Physical Disorders and gives him a Global

24   Assessment of Functioning score of 75.  "In

25   talking with the inmate about his commitment

26   offense, the inmate is very illustrative in his

27   psychological process.  He does not talk about

1    the victim; he talks about himself.  He states,

2    'I was never typical criminal.  This tragic event

3    happened under the extreme severely psychotic

4    depression that I was suffering.  It was so

5    devastating, after she broke up with me, I could

6    not go on.  I had nothing to live for.  I am so

7    deeply sorry.'  The inmate was sorry about

8    killing the victim, his former girlfriend;

9    however, one can also see he does not assume

10   responsibility, so he is not assuming

11   responsibility in a truly remorseful way.  The

12   inmate states that he is sorry about this

13   happening, but he also doesn't see how his

14   behavior or his issues play a part."  Under the

15   Assessment of Dangerousness, Dr. Carswell goes on

16   to say, "In terms of risk assessment, things

17   appear to happen around this inmate quite

18   frequently.  In other areas of his medical file

19   in another context, this inmate states that he

20   needs to be single-celled because he does not do

21   well living with a cellmate.  Therefore, there

22   are other areas where the inmate himself states

23   that he is at above-average risk for violence.

24   He is responsible for his own behavior; however,

25   he has accrued several 115s.  He does not appear

26   to be above or below risk for violence compared

27   to any other Level II inmates.  Within the

16

1   community, the risk factors for violence in this

2   inmate is unknown.  Several factors exist which

3   would show that in a community setting, his risk

4   for violence would be higher than that of the

5   average citizen, mainly due to his lack of

6   assuming responsibility and a lack of true

7   remorse for his commitment offense.  A

8   significant precursor which could lead to

9   violence for this inmate would be the continued

10  denial of any responsibility for this crime and

11  continuing along that mindset.  Inmate denies any

12  alcohol or drug problems, but a return to any

13  substance abuse or mind-altering chemicals

14  [inaudible] return to any type of criminal

15  activity that increase the precursors to return

16  to a violent action.  Under Parole Plans, it

17  should be noted that the inmate continues to want

18  to return to Turkey.  That in an interview with

19  his counselor, he stated that he, as a Muslim

20  from Turkey, he would not be safe on parole

21  anywhere in the United States and wishes to

22  return to Turkey."  There are no letters of

23  support from any family members or any plans

24  about parole, but there was a letter in the C-

25  File from the consulate of Turkey inquiring as to

26  when this inmate could possibly have a parole

27  date.  That's the only correspondence.  We did

1    send out 3042 Notices and received a letter from

2    the District Attorney from Marin County, and she

3    is present via phone line. At the appropriate

4    time, she will be given the opportunity to speak.

5    And, with that, unless there's anything that you

6    would like to add?

7         **ATTORNEY FERGUSON:** No. Only inasmuch as

8    the inmate has communicated to me his single-

9    minded focus on returning to Turkey.

10        **DEPUTY COMMISSIONER BLONIEN:** I'll return

11    to the Chair.

12        **PRESIDING COMMISSIONER DAVIS:** All right

13    then. Is there anything, Mr. Ferguson, that you

14    would like to clarify or inquire about at this

15    point?

16        **ATTORNEY FERGUSON:** No.

17        **PRESIDING COMMISSIONER DAVIS:** Does the --

18    before we move on to closing statement, does the

19    District Attorney have anything that you would

20    like to qualify -- or clarify -- or ask questions

21    about?

22        **DEPUTY DISTRICT ATTORNEY MITCHELL:** No.

23        **PRESIDING COMMISSIONER DAVIS:** All right.

24    Very well then. Closing?

25        **ATTORNEY FERGUSON:** Well, I'm a bit

26    hampered inasmuch as the inmate refused to meet--

27        **PRESIDING COMMISSIONER DAVIS:** Oh, I'm

18

1    sorry.  I went to you -- Ms. Mitchell, is -- it
2    is to you for closing.
3         **DEPUTY DISTRICT ATTORNEY MITCHELL:**  All
4    right.  Thank you very much.  I also continue to
5    strongly object to the parole of Mr. Bayramoglu.
6    This was a situation where he murdered his 21-
7    year-old girlfriend because she was attempting to
8    break off their relationship.  In essence, his
9    position was, "If I can't have her, then nobody
10   can"; and so he planned to take her life.  He
11   lured her to his apartment on the pretext of
12   their having a romantic interlude, and then he
13   shot her multiple times, killing her brutally.
14   Then he made some gestures about taking his own
15   life; of course, he did not take his own life but
16   survived to go to trial and plead his innocence.
17   He was disruptive through the entire court
18   proceedings.  At one time, he actually attempted
19   to run from the courtroom; and the record shows
20   that the investigating detective actually had to
21   chase him down and tackle him in order to
22   apprehend him.  Very shortly after this crime,
23   Mr. Bayramoglu basically began to take on the
24   position that he, and not Tracy Jones, was
25   actually the victim of these events; and that's
26   pretty much been his attitude to date over the
27   years, as we can see by his denying today to even

1   come before the Board to argue for release back

2   into the community.  This crime had a very

3   devastating impact on the victim's family.  As I

4   say, she was only 21 years of age.  Her family

5   members, I believe, have written letters to the

6   Board stating the impact on the family of the

7   loss of their sister and their relatives.  She

8   was much -- very much -- loved within her family.

9   Mr. Bayramoglu, this inmate, over the years has

10  continued to portray himself as the victim.  He

11  shows no remorse -- genuine remorse I mean -- or

12  insight into what was it that precipitated this

13  and how society could be assured that something

14  like this could never happen again.  He has been

15  disruptive in prison; he has numerous

16  disciplinary actions against him; he has failed

17  to program in any way, shape, or form; and his

18  parole plans are non-existent, really.  I do not

19  think that the parole board or any rational body

20  of reviewing the history of this case could

21  assume that Mr. Bayramoglu is, or practically

22  ever will be, suitable for parole.  The Marin

23  County District Attorney's Office will continue

24  to follow this case.  We are asking that you deny

25  this inmate parole for at least four years.  It

26  is unlikely that he will, even in that period of

27  time, become even remotely suitable for release.

20

1    This is always a very emotional thing for the

2    victim's family to have to gear up for these

3    proceedings.  I have been in contact with them,

4    and they continue to follow the course of this

5    case very carefully because of the impact of the

6    loss of their sister.  So thank you for the

7    opportunity of letting us enter our argument, but

8    we would strongly urge that you continue to keep

9    this individual locked up so that the community

10   can be safe from him.  Thank you very much.

11          **PRESIDING COMMISSIONER DAVIS:**  All right.

12   Thank you.  Counsel?

13          **ATTORNEY FERGUSON:**  Yes, just briefly.  In

14   arriving at a decision here today, I would ask

15   the Board to take into consideration the fact

16   that the inmate has been disciplinary free since

17   June of 2002; he has no criminal history apart

18   from the life crime; and with regard to the

19   evaluation of dangerousness, Dr. Carswell had

20   indicated that a significant precursor which

21   would lead to violence for this inmate would be

22   the continued use of alcohol or drugs.  I'm not

23   aware of his involvement of either of those

24   matters within custody -- during incarceration, I

25   should say -- and, on that, we would submit.

26          **PRESIDING COMMISSIONER DAVIS:**  All right.

27   Thank you.  Ms. Mitchell, we do have three

21

1 . letters from the victim's next of kin.   They are

2 marked as confidential, however, they [inaudible]

3 appear to be.

4         **DEPUTY COMMISSIONER BLONIEN:**   The

5 attachment, the envelopes --

6         **PRESIDING COMMISSIONER DAVIS:**   Right.

7         **DEPUTY COMMISSIONER BLONIEN:**   -- are

8 confidential.

9         **PRESIDING COMMISSIONER DAVIS:**   Okay.   So

10 you're not aware of any reason why those letters

11 would be kept confidential, are you?

12         **DEPUTY DISTRICT ATTORNEY MITCHELL:**   No,

13 other than, of course, the -- maybe the contact

14 information --

15         **PRESIDING COMMISSIONER DAVIS:** · Yes.

16         **DEPUTY DISTRICT ATTORNEY MITCHELL:**   -- of

17 these individuals, their address or anything like

18 that.

19         **PRESIDING COMMISSIONER DAVIS:**   Yes,

20 certainly.   We will go ahead and read those into

21 the record then at this time.   And the first one

22 -- "This is my statement regarding the upcoming

23 parole hearing for Fikri Bayramoglu.   On April

24 30th, 2003, [verbatim] Amanda Karen Ausloos, A-u-

25 s-l-o-o-s, was murdered by her estranged

26 boyfriend.   Amanda was my stepdaughter.   Her

27 boyfriend, after shooting her, successfully

22

1   murdered -- [inaudible] misprint on this but -- I
2   remember her father and siblings had wished him
3   alive so that -- just one second.  Well, I
4   remember her father and siblings had wished him
5   alive so that he could have lived with his guilt
6   and suffering, but after I have been through this
7   before -- on April 17th, 1980, my younger sister,
8   Tracy Lee Jones, was murdered by her estranged
9   boyfriend, Fikri Bayramoglu.  The difference is
10  he lived.  Not only my life but my entire
11  family's lives have been tortured daily by
12  memories, hopes, and fears.  Most memories are
13  good until that day.  We had 21 years spent with
14  a loving, caring, soon-to-be productive adult who
15  should have had a chance to be a companion,
16  mother, and mentor and someone we know who would
17  have been a friend to all she knew.  These were
18  her hopes and ours.  Fikri took so much from all
19  of us.  To add to all of this, the fear still
20  persists each day and every day because we have
21  to live with the prospect that Fikri will one day
22  be free.  His parole is our nightmare.  We are
23  the innocent and decent contributing to working
24  society but suffer with the possibility of those
25  who have committed horrendous crimes to come out
26  of their captivity or their captive environments
27  and release their anger once again.  I plead with

23

```
 1   the courts and parole board or anyone else who
 2   cares to listen to see this crime and this man
 3   for what he did and who he is and keep him where
 4   he belongs.  I truly don't know if I could
 5   withstand another heartbreak of this kind.  It's
 6   just so cruel."  Signed Dana Kaiser [phonetic],
 7   hyphen, Ausloos, A-u-s-l-o-o-s, and dated
 8   September 19th, 2006.  And then another letter
 9   dated September 20th, 2006, from Brandon Harris.
10   "To Whom it May Concern, on April 17th, 1980, a
11   day that I will never forget, my phone call -- or
12   a phone call -- came to our home that unleashed
13   an unspeakable horror and sorrow.  I was only 10
14   years old at the time, but I remember it like it
15   was yesterday.  My aunt, Tracy Lee Jones, was
16   murdered on this day by Fikri Bayramoglu.  My
17   mother, Michele Ann Harris, her name at the time,
18   who had to basically raise her 21-year-old
19   sister, was devastated.  At 10 years old, I
20   became aware of how cowardly and cruel people in
21   this world can be.  Tracy Lee Jones was not
22   allowed to live out her life, due to the cowardly
23   and callous actions of Fikri Bayramoglu.
24   Releasing this man from prison will cause our
25   family anxiety and fear that we do not deserve.
26   This man made a choice to murder an innocent
27   young lady, and the 26 years of prison -- and 26
```

24

1   years of prison -- time does not compensate for
2   the loss he caused so many people.  Please do the
3   right thing and keep this man in prison."  And
4   then a -- and then later -- and that letter
5   [inaudible] was September 20th, 2006.  And
6   finally a letter dated September 18th, 2006, by
7   Mickey Harris, hyphen, Davis.  "This is my
8   statement regarding the upcoming parole hearing
9   for Fikri Bayramoglu.  On April 17th, 1980, my
10  younger sister was murdered by Fikri.  I received
11  a phone call -- the one you hear about other
12  people getting and never think it can happen to
13  you or your family:  'Your sister is dead.  She
14  was shot four times.'  My mother who was at
15  Stanford Hospital at the time battling cancer.
16  Not only do I have to live with the pain of
17  receiving that call about my baby sister, but I
18  also had to deliver the news to my mother who was
19  lying in a hospital bed.  We tried to cope.  We
20  had the funeral.  We went to work to escape the
21  terrible pain, the pain that still lives today,
22  however, every day in our hearts and minds and in
23  our prayers, the pain that sent me home from work
24  today to try to write this statement just one
25  more time.  Every parole hearing brings back the
26  original pain for me as though it happened
27  yesterday.  Tracy was kind; she was generous.

```
 1    She wanted to keep Fikri, but he was having a
 2    hard time adjusting to life here.  He was having
 3    a lot of difficulty with the English language, he
 4    had difficulty trusting anyone, he allowed my --
 5    or followed -- my sister when she went out with
 6    her girlfriends and listened to her phone calls.
 7    He was so jealous and needy that she finally had
 8    enough and moved in with our mother to get
 9    herself a job in the [inaudible] industry and
10    made new friends.  He kept calling her to come
11    back or at least to come and get her stereo.  She
12    finally agreed to come pick up the stereo.  That
13    was April 17th, 1980, the day that he planned her
14    death and shot her four times and killed her.  My
15    grandmother asked me what Tracy was like, and I -
16    - and I explained that she was kind and generous
17    -- I'm sorry -- my grandchildren asked me what
18    Tracy was like, and I explained that she was kind
19    and generous.  They will never have the
20    opportunity to know her, however, because his
21    anger robbed of them -- robbed them of her.  We -
22    - my husband, my children, my grandchildren, my
23    sister and her family -- would not feel safe if
24    we -- if he -- were let out of prison.  If he
25    obtained an unmarked gun before, he could do it
26    again.  Our decisions decide our lives.  Fikri
27    made his decision on April 17th, 1980, when he
```

1 planned my sister's death and robbed us of 21

2 years -- robbed us of a 21-year-old red-haired

3 girl just beginning her life.  He needs to think

4 about what he did for the rest of his life in

5 prison where he cannot harm another human being."

6 That, again, is signed by Mickey Harris-Davis.

7 Does that conclude all the letters, to the best

8 of your knowledge,

9 Ms. Mitchell?

10 **DEPUTY DISTRICT ATTORNEY MITCHELL:**  Yes,

11 there is a letter from the Marin County District

12 Attorney and then a letter from myself, which I

13 believe you have made reference to already.

14 **PRESIDING COMMISSIONER DAVIS:**  Yes,

15 correct.

16 **DEPUTY DISTRICT ATTORNEY MITCHELL:**  Okay.

17 That's it.

18 **PRESIDING COMMISSIONER DAVIS:**  All right.

19 Officer, I understand that you had direct contact

20 with Mr. Bayramoglu; is that correct?

21 **OFFICER WEIGELT:**  Yes, sir.

22 **PRESIDING COMMISSIONER DAVIS:**  And that

23 was at the direction of the panel to ensure that

24 he knew his hearing was coming up and that he did

25 have a right to attend it; is that correct?

26 **OFFICER WEIGELT:**  Yes, sir.

27 **PRESIDING COMMISSIONER DAVIS:**  And also to

27

1    present him with some paperwork as prepared by

2    his counsel with regard to any possible

3    stipulation; is that correct?

4         OFFICER WEIGELT:  Yes, sir.

5         PRESIDING COMMISSIONER DAVIS:  And what

6    was his response to you?

7         OFFICER WEIGELT:  On both counts, he

8    refused, stating that -- to -- pardon my language

9    -- "Fuck the Board and fuck the hearing."

10        PRESIDING COMMISSIONER DAVIS:  All right.

11   And you know that -- the -- inmate by sight?

12        OFFICER WEIGELT:  I know the inmate by

13   sight.  I do not work with him on a daily basis,

14   but I know him [inaudible].

15        PRESIDING COMMISSIONER DAVIS:  But you're

16   sure you were talking to the right person?

17        OFFICER WEIGELT:  I am positive I was

18   talking to the right person.

19        PRESIDING COMMISSIONER DAVIS:  You need to

20   identify yourself for the record, please.

21        OFFICER WEIGELT:  My name is Officer Brian

22   Weigelt, W-e-i-g-e-l-t.

23        PRESIDING COMMISSIONER DAVIS:  Very well.

24   All right.  Was there anything else, Officer?

25        OFFICER WEIGELT:  No.

26        PRESIDING COMMISSIONER DAVIS:  All right.

27   Thank you very much.  All right, absent anything

28

1    else from defense or the prosecution, we will

2    recess for our deliberation.    All right, since I-

3                       **R E C E S S**

4                       --o0o--

5

6

7

8

9

10

11

12

13

14

15

16

17

29

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **DEPUTY COMMISSIONER BLONIEN:** We are on

4     record.

5          **PRESIDING COMMISSIONER DAVIS:** All right.

6     Let the record reflect that all those previously

7     identified as being in the room or with us by

8     telephone conference have returned. This is in

9     the matter of Fikri Bayramoglu, and I apparently

10    have been mispronouncing his first name, but I

11    have it spelled phonetically as Fikri, F-i-k-r-i,

12    Bayramoglu; CDC Number C-54604. The panel

13    reviewed all information received from the public

14    and relied on the following circumstances in

15    concluding that the prisoner is not suitable for

16    parole and would pose an unreasonable risk of

17    danger to society or a threat to public safety if

18    released from prison. We've come to this

19    conclusion first by the commitment offense

20    itself. The offense was carried out in an

21    especially cruel and callous manner; the offense

22    was carried out in a calculated manner; and the

23    motive for the crime was inexplicable in relation

24    to the offense. These conclusions are drawn from

25    the Statement of Facts wherein the prisoner, for

26    reasons still best known to himself, armed

27    **FIKRI BAYRAMOGLU   C-54604    DECISION PAGE 1    10/25/06**

30

1    himself and shot and killed the victim who was

2    not armed and presented no threat to the inmate.

3    With regard to a previous record, we find that he

4    had no prior record -- no prior arrest record.

5    With regard to institutional behavior, we find

6    that he has programmed in a limited manner while

7    incarcerated, failed to develop a marketable

8    skill which could be put to use upon release, not

9    sufficiently participated in self-help, and

10   failed to demonstrate positive evidence of

11   change.  His conduct while incarcerated includes

12   six 128(a) counseling chronos, the last of which

13   was in six of '02 -- I'm sorry -- 13 128(a)s, the

14   last of which was in six of 02 -- and 13 serious

15   115 disciplinary reports, the last of which was

16   in -- also in six of '02.  With regard to the

17   psychological report dated May of 2002 by Dr.

18   Carswell, the panel finds that it is not

19   supportive of release; and quoting directly from

20   the document under Axis II, "Identifies a

21   Personality Disorder and NOS with Anti-Social

22   Dependent and Grandiose Features"; and under the

23   Review of the Life Crime, again quoting, "When

24   talking about his commitment offense, Inmate

25   Bayramoglu is very illustrative in his

26   psychological process.  He does not talk about

27   **FIKRI BAYRAMOGLU  C-54604    DECISION PAGE 2    10/25/06**

31

1    the victim; he talks about himself.  He stated,

2    quote, 'I was never a typical criminal.  This

3    tragic event happened under the extreme --

4    extremely -- severe psychotic depression that I

5    was suffering.  It was so devastating.  After she

6    broke up with me, I could not go on.  I had

7    nothing to live for.  I am so deeply sorry,'

8    closed quotes.  The inmate was sorry -- and it

9    goes on -- the inmate was sorry about killing his

10   victim, parenthesis, (his former girlfriend),

11   closed parenthesis; however, as one can also see,

12   he does not assume responsibility, so he is not

13   assuming responsibility in a truly remorseful

14   way.  The inmate states that he is sorry about

15   this happening, but he also doesn't see how his

16   behavior or his issues played a part."  And then

17   under the Assessment of Dangerousness, second

18   paragraph dedicates [verbatim], "In terms of a

19   risk assessment, things appear to happen around

20   this inmate quite frequently.  In other areas of

21   his medical file in other context, this inmate

22   states that he needs to be a single -- or be in a

23   single cell -- because he does not do well living

24   with a cellmate; therefore, there are other areas

25   where the inmate himself states that he is above-

26   average risk for violence."  With regard to

27   **FIKRI BAYRAMOGLU  C-54604   DECISION PAGE 3  10/25/06**

32

1    parole plans, he does not have viable residential

2    plans and does not have acceptable -- does not

3    have employment plans.  We would note that he

4    does -- has indicated -- to several people,

5    apparently, and including counsel, that he wishes

6    to return to Turkey; however, he does not have

7    support letters -- to note, that should he want

8    to do that, he would have to -- should he want to

9    transfer his custody to Turkey -- he would have

10   to apply to do so, and he would need to see his

11   counselor to obtain specific information on how

12   that might be accomplished.  With regard to the

13   3042 Notices, we note that the District Attorney

14   from Marin County was here in person by

15   representative by telephone conference and does

16   oppose parole.  Nevertheless, we do want to

17   commend the inmate for being disciplinary free

18   since his last hearing.  However, this positive

19   aspect of his behavior does not outweigh the

20   factors for unsuitability.  In a separate

21   decision, the hearing panel finds that the

22   prisoner has been convicted of murder and it is

23   not reasonable to expect that parole would be

24   granted during the next four years.  We've come

25   to this conclusion first by the incident offense

26   itself.  The inmate -- or the offense -- was

27   **FIKRI BAYRAMOGLU   C-54604    DECISION PAGE 4   10/25/06**

33

1    carried out in an especially cruel and callous

2    manner; the offense was carried out in a

3    calculated manner; and the motive for the crime

4    was inexplicable in relation to the offense.

5    These conclusions are drawn from the Statement of

6    Facts wherein the prisoner, for reasons still

7    best known to himself, armed himself and shot and

8    killed the victim who was not armed and presented

9    no threat to him.  With regard to institutional

10   behavior, we find that he programmed in a limited

11   manner while incarcerated, failed to develop a

12   marketable skill which could be put to use upon

13   release, not sufficiently participated in self-

14   help, and failed to demonstrate any positive

15   change.  His conduct while incarcerated includes

16   13 128(a) counseling chronos, the last of which

17   was in six of '02, and 13 serious 115

18   disciplinary reports, the last of which was in

19   six of '02.  The psychological report of May 2002

20   by Dr. Carswell -- that's C-a-r-s-w-e-l-l -- was,

21   again, not supportive for all the reasons

22   previously quoted into the record in the first

23   decision.  With regard to parole plans, we find

24   that he does not have viable residential plans

25   and does not have employment plans for the United

26   States.  Although it is his desire to return to

27   **FIKRI BAYRAMOGLU  C-54604    DECISION PAGE 5    10/25/06**

34

1    Turkey, he does not have support letters or has,

2    apparently, not made any affirmative steps in

3    that regard as well.  With regard to the 3042

4    Notices, we note that the District Attorney from

5    Marin County, once again, is here in person by

6    representative by video -- by telephone --

7    conference and does oppose parole.  With regard

8    to recommendations, the panel would recommend

9    that he have no more 128s or -- 128(a)s -- or

10   115s; that, as available, he upgrade

11   vocationally; as available, that he participate

12   in self-help; that he develop parole plans; earn

13   positive chronos; and cooperate with clinicians

14   during the upcoming clinical evaluations.  And we

15   are going to request a new psychological

16   evaluation be conducted prior to the next

17   hearing.  Commissioner, anything you'd like to

18   add?

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   **FIKRI BAYRAMOGLU  C-54604    DECISION PAGE 6    10/25/06**

35

1          **DEPUTY COMMISSIONER BLONIEN:**    No.   Thank

2    you.

3          **PRESIDING COMMISSIONER DAVIS:**   Therefore,

4    we are adjourned.

5                   **A D J O U R N M E N T**

6                        --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED FOUR YEARS.

24    THIS DECISION WILL BE FINAL ON: February 22, 2007

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    FIKRI BAYRAMOGLU   C-54604   DECISION PG 7 10/25/06

36

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, C. M. LOPEZ, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed from electronic audio file and which covers a total of pages numbered 1 through 35, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of FIKRI BAYRAMOGLU, CDC No. C-54604, on OCTOBER 25, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated JANUARY 17, 2007 at Sacramento County, California.

C. M. Lopez

------------------------------
C. M. Lopez, Transcriber
**NORTHERN CALIFORNIA COURT REPORTERS**