# EXHIBIT 8

Name        **FIKRI BAYRAMOGLU**

Address        **CTF-C-ZW-329-L**

**Highway 101 North - P.O. BOX 689**

**Soledad, California 93960   USA**

CDC or ID Number   **C-54604**



FILED

MAR 1 3 2007

KIM TURNER, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: Andrea Anderson, Deputy

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF MARIN
*(Court)*

---

| **FIKRI BAYRAMOGLU** |
|---|
| Petitioner |
| vs. |
| |
| Respondent |
| **BEN CURRY, Warden, CTF** |

PETITION FOR WRIT OF HABEAS CORPUS

No.  _**SC152471A**_
*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS — READ CAREFULLY

> • **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**
>
> • **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

• Read the entire form *before* answering any questions.

• This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

• Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

• If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

• If you are filing this petition in the Court of Appeal, file the original and four copies.

• If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

• Notify the Clerk of the Court in writing if you change your address after filing your petition.

• In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor.  See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

---

> Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]      PETITION FOR WRIT OF HABEAS CORPUS      Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

This petition concerns:

- [ ] A conviction      [X] Parole
- [ ] A sentence      [ ] Credits
- [ ] Jail or prison conditions      [ ] Prison discipline
- [X] Other *(specify)*: Denial of transfer pursuant to U.S.-Turkey Prisoner Transfer Treaty.

1. Your name:    FIKRI BAYRAMOGLU

2. Where are you incarcerated?   CTF-Central Soledad, California

3. Why are you in custody?   [X] Criminal Conviction    [ ] Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Second Degree Homicide without any deadly weapon enhancement.

b. Penal or other code sections:   187 P.C.

c. Name and location of sentencing or committing court:   Marin County Superior Court.

d. Case number:   8215.

e. Date convicted or committed:   Friday the 13th August, 1982.

f. Date sentenced:   September 21, 1982.

g. Length of sentence:   -15-Years-To-Life.

h. When do you expect to be released?   Don't know. Minimum/Maximum EPRD: April 19, & Jan. 25, 90/94.

i. Were you represented by counsel in the trial court?   [X] Yes.    [ ] No.   If yes, state the attorney's name and address:

  Mr. Mark B. Davis, Deputy Public Defender, County of Marin.

  3501 Civic Center Dr. Room 139 - San Rafeal, CA 94903. Petitioner is completely indigent, and respectfully requests Court appoint Mr. Thomas Master to represent him in

4. What was the LAST plea you entered? *(check one)*   this matter. See his letter of Jan. 28, 2007, to Pet.

[X] Not guilty   [ ] Guilty   [ ] Nolo Contendere   [X] Other: Not guilty by reason of insanity.

5. If you pleaded not guilty, what kind of trial did you have?

[X] Jury   [ ] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial

6.  GROUNDS FOR RELIEF.

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." (If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)

The California Board of Parole Hearings' denial of transfer pursuant to U.S.-Turkey Prisoner Transfer in violation of Calif. Gov. Code Section 12012.1, CCR Title 15 Div. II § 2402(d)(2)(3)(4)(5)(6)(7) 2003(c), 2281/2281(d), P. C. 1170(a), 3041(a), 3041.5(2)(c)5011. In which, imposes an affirmative obligation on the BPH to grant parole/transfer, in which, creates a legally cognizable liberty interest in parole/transfer. There is no "some or any evidence" that the petitioner's transfer to his home country would pose an unreasonable risk to society." Petitioner has an "active INS Hold" and must be deported pursuant to 8 USC § 1101(a)(43)(a) "conclusively presume" to be deportable. (8 USC § 1228c)(5)

3-a: Supporting facts: 1(d)(1)(c). Cite: 2006 DJDAR 9682, Calf. Crt. Ap. 1st. Ap. Dist NO: A112673.

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. If necessary, attach additional pages. CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See In re Swain (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is who did exactly what to violate your rights at what time (when) or place (where). (If available, attach declarations, relevant records, transcripts or other documents supporting your claim.)

Petitioner refused to attend Board of Parole Hearings of Oct. 25, 2007, for the reasons noted in his attached letter to the BPH dated Aug. 10, 2006. Nevertheless, on that date, the BPH denied his "transfer" to his home country -4- more years behind his back, this will be his "third" -4- year denial of "transfer" to his home country, Republic of Turkey in a row. BPH admitted that ".. there was a letter in the C-File from the consulate of Turkey inquiring as to when this inmate could possible have a parole date." Attorney appointed by the BPH did not have petitioner's authorization for representation on C-File review. Last time (Sept. 16, 2002) petitioner was before BPH for his "transfer" ordered out of the Board room and denied -4- year denial, "within -3- minutes!" Commissioner "Sir, you don't seem to understand that this panel has no authority to grant transfer." Attorney Mr. Spowart: "I think the Board of Prison Terms has the power to send him to Turkey." Who was lying Your Honor? "... The question before this Honorable Court is whether the punishment fit the crime or not? Petitioner is not "suitable for parole" or that he's a danger to society, are nothing but a BOGUS reasons for the denial to this home country. Petitioner is extremely and very deeply sorry for what he has done! Petitioner is willing to kiss the feet of the victim's immediate family members, if that will make them feel any better! Please see petitioner's recent letter to the victim's family members dated: March 5, 2007. Petitioner respectfully request to this Honorable Court that the court makes sure that the victim's family members noted in this letter, receives his letter. It matters to me Your Honor. I feel obligated, and Tracy would like me to make this very sincere apology. Enclosed a letter from the Uncommon Law Mr. Thomas Master, dated: Jan. 29, 2007, RE: Recent Parole Denial, perhaps they're willing to represent me. If this Court will appoint an attorney, this petitioner would like to have Mr. Master represent him in this matter.

b.  Supporting cases, rules, or other authority (optional):
(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)

Denial of transfer was in violation of his State and Federal Due Process & Equal Protection Rights Under the 5th, 6th, 14th Amendments of the U.S. Constitution and similar provisions of the Calf. Constitution. See Mcquillin v. Duncan, 303 F. 895, 902 (9th Cir. 2002. California's scheme "gives rise to a congizable liberty interest in release on parole, which cannot be denied without adequate procedural due process protections." Also see Jancsek v. Oregon Bd of Parole, 833, F 2d 1389, 1390, (9th Cir. 1987); See Green holts v. Inmates of Nebraska Penal & Corr. Complex, 442, U.S. 1 1997); Biggs v. In re Rosenkrantz, 29, Cal. 4th 616 (2003). M. Iron, II. U.S. Dist (ED) CIV-S-04-0220-LKK.

7. Ground 2 or Ground _____ (if applicable): California Board of Parole Hearings Decision Page -1-
10/25/06, "The offense was carried out in an especially cruel and callous manner; he
offense was carried out in a calculated manner, and the motive for the crime was inex-
plicable in relation to the offense" has no regard for the undisputed facts concerning
the "FACTS PERTAINING TO THE INCIDENT" noted in the Petitioner's "attached" "APPELLANT'S
OPENING BRIEF" that was filed in the USCA for the Ninth Cir. NO.: 85-2826. Cite: BAYRAM-
OGLU v. ESTELL, 806 R 2nd 880 (9th Cir. 1986). According to Deputy Public Defender Ms.
Gaile O'Connor, Marin County: "The case is not a murder case Your Honor," and Ms. M.
O'Connell, BPH Commissioner: "This was a case of a manslaughter." Petitioner believes that
he has far more mitigating circumstances than all of these above noted "cold-blooded-dis-

a. Supporting facts: passionate-BASE BALL MURDERERS" and have served many, many more years!

1. The Board admitted in its attached "Decision" section of the transcripts page -2-
that "...we find that he had no prior record...arrest." Petitioner has not "...program-
med in a limited manner." Petitioner is a foreign inmate, nevertheless, earned his GED
and have certificate for shoe repair, and have participated at least 20 to 30 group
therapy sessions. Other foreign inmates are not even required to pass the GED exams, or
participate in any group therapy. One court noted: So called "meaningless programming."
2. Petitioner did not "...failed to develop a marketable skill which could be put to
use upon release." Upon release from prison, Petitioner will be at the other end of the
world, in his home country, Turkey. BPH is not responsible for petitioner's failure to
support himself in his home country. Petitioner has support and "notarized" statement
from his brother in Turkey that he will give full support for his living in Turkey.
3. Petitioner has no so called "serious disciplinary" during his incarceration that
he is guilty of! In fact, there's CDC 602 attached to all BOGUS CDC 115's were written
and all have been simply just gloss-over, rubber-stamped denied by the CDC! Not a single
CDC 602 in "style and in substance" ever granted by the CDC during his -27- of incar!
4. Petitioner respectfully requests an Order from this court for illegally" subject-
ing petitioner to cruel and unusual pain in that notorious "Corcoran" SHU for -15- pain-
ful months, subjecting his life and liberty in imminent danger, and using that BOGUS
SHU Term and other CDC 115's he was "forced" to received (If he was not there "ille-
gally" he'd never received those BOGUS CDC 115's in the first place!) to deny his trans-
fer to his home country, from the CDC/BPH. The CDC/BPH should also apologized to peti-
tioner in verbal and in writing for "stealing his $75,000 lawsuit, plus pain and suf-
fering for that "illegal SHU Term." If petitioner was "...willing to "trade" this ille-
gal SHU case for California's agreement to permit you to "go" home" petitioner's transfer
would've been approved by the BPH! Petitioner respectfully requests an investigation
whether I/M Mikael Schiold, CDC #D-31112 approved for transfer to his home country with-
out first being found "suitable for parole"? The BPH has no moral, or any legal justi-
fication for making this petitioner suffer more, especially, in comparison to some of
"cold-blooded-dispassionate-murderers" already have been granted parole and transfer
by the BPH. This was petitioner's "third" -4- year denial of parole in a row! He will
be serving more than -30- years for his sentence, and yet, no end in sight, at the same
time, these above noted "cold-blooded-dispassionate-murderers" are being ordered/gran-
ted parole/transfer by the BPH repeatedly, is this justice?

b. Supporting cases, rules, or other authority: Ernie Smith, (2003) 114 Cal. Ap. 4th Dist. In re Melvn H.
Coleman, U.S. Dist. (ED) CA. CIV-S-96-0783-LKK-GGH P. In re Geoge Scott, Crt. Ap. First
A. Dist. In re Rozenkrantz, Sup. Crt. of Los Angeles, Case NO.: BH003529 Order Filed:
June 26, 06. Ordering release because: "Petitioner has now served in excess of the maxi-
mum term for both second degree and first degree murder." He was convicted of 2nd degree
murder, and sentenced to "-17-years-to-life" for shooting the victim with an "UZI-MAH-
INCE-GUN" -10- times" in 1986. Served -6- years less than this petitioner, and was
Ordered released. In re Jeffrey Elkins, sentenced to -25-years-to-life for first degree
murder for "beating a fellow drug dealer to death with a base ball bat, dumped the corpse
down a hill. Governor said: "Senseless and gruesome murder." Ordered released by the
Supreme Court of California, Case NO.: S140558.

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes.  ☒ No.    If yes, give the following information:
   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

   _____

   b. Result: _____    c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:  (1) _____

        (2) _____

        (3) _____

   f. Were you represented by counsel on appeal?  ☐ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:

   _____

9. Did you seek review in the California Supreme Court?  ☐ Yes.  ☒ No.    If yes, give the following information:

   a. Result: _____    b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:  (1) _____

        (2) _____

        (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:    N/A

   _____

   _____

11. Administrative Review:
    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

        See attached BPH "Decision" transcripts of Oct. 25, 2006. Also attached Petiti-
   oner's letter to the BPH dated: Aug. 10, 2006, his letter of Dec. 10, 2006, to the
   BPT "Decision Review Unit" and copy of his letter to Hon. Jerrey E. Brown, Attorney
   General of State of California. Attorney James Dirks' letters of April 9/19, 1999 &
   May 24, 2000, concerning Petitioner's "stolen lawsuits." Letter from the Grand Nation-
   al Assembly of Turkey dated: "Ankara, 13 November 2003, -2- pages, and a letter from
   the Attorney Ms. Gokce Su Gulleroglu, dated: 24/12/2004, and the letter from Mr.
   Thomas Master, dated: Jan. 29, 2007. For "FACTS PERTAINING TO THE INCIDENT" please
   see Petitioner's "APPELLANT'S OPENING BRIEF" filed in the USCA for the Ninth Circuit
   Case NO.: 85-2862. Cite: BAYRAMOGLU v. ESTELL, 806 R 2nd 880 (9th Cir. 1986).
       Additional letters from Attorney Dirks dated Mach 7, & April 19, 2000, to petitioner
   and copy of the from Mr. Eecument Kilic, President of Assembly of Turkish American
   Associations dated: March 21, 2003, to "Hon. Judge Verna A. Adam." Copies of the let-
   ters from Mr. Mark B. Davis and Gaile O'Connor, Deputy Public Defender's Office Marin
   County, dated: Feb. 21 & 27, 1989, to the BPT on the Petitioner's behalf.

    b. Did you seek the highest level of administrative review available?  ☒ Yes.  ☐ No.
       *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

       (2) Nature of proceeding (for example, "habeas corpus petition"): _____

       (3) Issues raised: (a) _____

           (b) _____

       (4) Result (Attach order or explain why unavailable): _____

       (5) Date of decision: _____

   b. (1) Name of court: _____

       (2) Nature of proceeding: _____

       (3) Issues raised: (a) _____

           (b) _____

       (4) Result (Attach order or explain why unavailable): _____

       (5) Date of decision: _____

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

                    No delay.

BPH Transcripts for the Hearing of Oct. 25, 2006, was received Feb. 28, 2007.

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☒ Yes. ☐ No. If yes, explain:

U.S. District Court (ND) CA. Petition for Writ of H.C. NO. C 06-2249 VRW (PR).

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

This is the first appropriate Court in this matter.

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: March 7, 2007.

▶ _____
                            (SIGNATURE OF PETITIONER)

29

1       CALIFORNIA BOARD OF PAROLE HEARINGS

2                D E C I S I O N

3           DEPUTY COMMISSIONER BLONIEN:  We are on

4    record.

5           PRESIDING COMMISSIONER DAVIS:  All right.

6    Let the record reflect that all those previously

7    identified as being in the room or with us by

8    telephone conference have returned.  This is in

9    the matter of Fikri Bayramoglu, and I apparently

10   have been mispronouncing his first name, but I

11   have it spelled phonetically as Fikri, F-i-k-r-i,

12   Bayramoglu; CDC Number C-54604.  The panel

13   reviewed all information received from the public

14   and relied on the following circumstances in

15   concluding that the prisoner is not suitable for

16   parole and would pose an unreasonable risk of

17   danger to society or a threat to public safety if

18   released from prison.  We've come to this

19   conclusion first by the commitment offense

20   itself.  The offense was carried out in an

21   especially cruel and callous manner; the offense

22   was carried out in a calculated manner; and the

23   motive for the crime was inexplicable in relation

24   to the offense.  These conclusions are drawn from

25   the Statement of Facts wherein the prisoner, for

26   reasons still best known to himself, armed

27   FIKRI BAYRAMOGLU  C-54604   DECISION PAGE 1   10/25/06

30

1    himself and shot and killed the victim who was

2    not armed and presented no threat to the inmate.

3    With regard to a previous record, we find that he

4    had no prior record -- no prior arrest record...

5    With regard to institutional behavior, we find

6    that he has programmed in a limited manner while

7    incarcerated, failed to develop a marketable

8    skill which could be put to use upon release, not

9    sufficiently participated in self-help, and

10   failed to demonstrate positive evidence of

11   change.  His conduct while incarcerated includes

12   six 128(a) counseling chronos, the last of which

13   was in six of '02 -- I'm sorry -- 13 128(a)s, the

14   last of which was in six of 02 -- and 13 serious

15   115 disciplinary reports, the last of which was

16   in -- also in six of '02.  With regard to the

17   psychological report dated May of 2002 by Dr.

18   Carswell, the panel finds that it is not

19   supportive of release; and quoting directly from

20   the document under Axis II, "Identifies a

21   Personality Disorder and NOS with Anti-Social

22   Dependent and Grandiose Features"; and under the

23   Review of the Life Crime, again quoting, "When

24   talking about his commitment offense, Inmate

25   Bayramoglu is very illustrative in his

26   psychological process.  He does not talk about

27   FIKRI BAYRAMOGLU  C-54604    DECISION PAGE 2    10/25/06

31

1     the victim; he talks about himself.  He stated,

2     quote, 'I was never a typical criminal.  This

3     tragic event happened under the extreme --

4     extremely -- severe psychotic depression that I

5     was suffering.  It was so devastating.  After she

6     broke up with me, I could not go on.  I had

7     nothing to live for.  I am so deeply sorry,'

8     closed quotes.  The inmate was sorry -- and it

9     goes on -- the inmate was sorry about killing his

10    victim, parenthesis, (his former girlfriend),

11    closed parenthesis; however, as one can also see,

12    he does not assume responsibility, so he is not

13    assuming responsibility in a truly remorseful

14    way.  The inmate states that he is sorry about

15    this happening, but he also doesn't see how his

16    behavior or his issues played a part."  "And then

17    under the Assessment of Dangerousness, second

18    paragraph dedicates [verbatim], "In terms of a

19    risk assessment, things appear to happen around

20    this inmate quite frequently.  In other areas of

21    his medical file in other context, this inmate

22    states that he needs to be a single -- or be in a

23    single cell -- because he does not do well living

24    with a cellmate; therefore, there are other areas

25    where the inmate himself states that he is above-

26    average risk for violence."  With regard to

27    FIKRI BAYRAMOGLU  C-54604    DECISION PAGE 3    10/25/06

·32

1   parole plans, he does not have viable residential

2   plans and does not have acceptable -- does not

3   have employment plans.  We would note that he

4   does -- has indicated -- to several people,

5   apparently, and including counsel, that he wishes

6   to return to Turkey; however, he does not have

7   support letters -- to note, that should he want

8   to do that, he would have to -- should he want to

9   transfer his custody to Turkey -- he would have

10   to apply to do so, and he would need to see his

11   counselor to obtain specific information on how

12   that might be accomplished.  With regard to the

13   3042 Notices, we note that the District Attorney

14   from Marin County was here in person by

15   representative by telephone conference and does

16   oppose parole.  Nevertheless, we do want to

17   commend the inmate for being disciplinary free

18   since his last hearing.  However, this positive

19   aspect of his behavior does not outweigh the

20   factors for unsuitability.  In a separate

21   decision, the hearing panel finds that the

22   prisoner has been convicted of murder and it is

23   not reasonable to expect that parole would be

24   granted during the next four years.  We've come

25   to this conclusion first by the incident offense

26   itself.  The inmate -- or the offense -- was

27   FIKRI BAYRAMOGLU  C-54604    DECISION PAGE 4   10/25/06

33

1   carried out in an especially cruel and callous

2   manner; the offense was carried out in a

3   calculated manner; and the motive for the crime

4   was inexplicable in relation to the offense.

5   These conclusions are drawn from the Statement of

6   Facts wherein the prisoner, for reasons still

7   best known to himself, armed himself and shot and

8   killed the victim who was not armed and presented

9   no threat to him. With regard to institutional

10  behavior, we find that he programmed in a limited

11  manner while incarcerated, failed to develop a

12  marketable skill which could be put to use upon

13  release, not sufficiently participated in self-

14  help, and failed to demonstrate any positive

15  change. His conduct while incarcerated includes

16  13 128(a) counseling chronos, the last of which

17  was in six of '02, and 13 serious 115

18  disciplinary reports, the last of which was in

19  six of '02. The psychological report of May 2002

20  by Dr. Carswell -- that's C-a-r-s-w-e-l-l -- was,

21  again, not supportive for all the reasons

22  previously quoted into the record in the first

23  decision. With regard to parole plans, we find

24  that he does not have viable residential plans

25  and does not have employment plans for the United

26  States. Although it is his desire to return to

27  FIKRI BAYRAMOGLU   C-54604    DECISION PAGE 5   10/25/06

34

1    Turkey, he does not have support letters or has,

2    apparently, not made any affirmative steps in

3    that regard as well.  With regard to the 3042

4    Notices, we note that the District Attorney from

5    Marin County, once again, is here in person by

6    representative by video -- by telephone --

7    conference and does oppose parole.  With regard

8    to recommendations, the panel would recommend

9    that he have no more 128s or -- 128(a)s -- or

10   115s; that, as available, he upgrade

11   vocationally; as available, that he participate

12   in self-help; that he develop parole plans; earn

13   positive chronos; and cooperate with clinicians

14   during the upcoming clinical evaluations.  And we

15   are going to request a new psychological

16   evaluation be conducted prior to the next

17   hearing.  Commissioner, anything you'd like to

18   add?

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   FIKRI BAYRAMOGLU  C-54604   DECISION PAGE 6   10/25/06

35

1          DEPUTY COMMISSIONER BLONIEN:    No.    Thank

2      you.

3          PRESIDING COMMISSIONER DAVIS:    Therefore,

4      we are adjourned.

5                    A D J O U R N M E N T

6                         --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23      PAROLE DENIED FOUR YEARS.

24      THIS DECISION WILL BE FINAL ON:_____FEB 2 2 2007_____

25      YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26      DATE, THE DECISION IS MODIFIED.

27      FIKRI BAYRAMOGLU   C-54604   DECISION PG 7 10/25/06

36

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, C. M. LOPEZ, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed from electronic audio file and which covers a total of pages numbered 1 through 35, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of FIKRI BAYRAMOGLU, CDC No. C-54604, on OCTOBER 25, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated JANUARY 17, 2007 at Sacramento County, California.

_C. M. Lopez_

_____
C. M. Lopez, Transcriber
**NORTHERN CALIFORNIA COURT REPORTERS**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| FIKRI BAYRAMOGLU, | ) NO. 85-2862 |
| | ) |
| Plaintiff-Appellant, | ) DC NO. CV 84-6433-MHP |
| | ) Northern California |
| v. | ) |
| | ) |
| W. ESTELLE, | ) |
| | ) |
| Defendant-Appellee. | ) |
| | ) |

APPELLANT'S OPENING BRIEF

MICHAEL B. BASSI, ESQ.
MICHAEL B. BASSI
A Law Corporation
605 Market St., 9th Flr.
San Francisco, CA 94105
(415) 546-1155

Attorney for APPELLANT
FIKRI BAYRAMOGLU

C-54604

permitted when the appealable order is served by mail. Rule 26(c), Federal Rules of Appellate Procedure.

III.

## STATEMENT OF FACTS

A. FACTS PERTAINING TO THE INCIDENT.

On April 17, 1980, at approximately 9:00 P.M., Appellant staggered into the liquor store across the street from his apartment, bleeding profusely from stab wounds to his chest and abdomen. The manager telephoned for help. (RT 1011-1013, 1927-1029.) Appellant was screaming that he wanted to die; he said repreatedly that he had "killed Tracy" and wanted to kill himself. (RT 1016, 1032.) He told paramedics who responded to the manager's call, "Stop treating me. I want to be dead. Go help Tracy." (RT 1032.) He repeated this statement over and over, for about ten minutes, until he was placed in an ambulance. (RT 1032.)

San Rafael, California police officers followed a trail of drops of blood from the liquor store, across the street to Appellant's apartment, where the door was ajar. (RT 538-540.) There, they discovered the nude body of Appellant's girlfriend Tracy Jones lying on the floor, dead from gunshot wounds. (RT 543.)

The revolver which had fired the shots was found in the apartment. (RT 650-651.) Five spent shell casings were found in the hallway. (RT 653-654.) A box of unused cartridges was found outside the front door, underneath a hibachi. (RT 658.) Pieces of paper with Turkish writing were found on the floor near the coffee table. (RT 661.)

At trial, Appellant testified that Tracy had met him at his apartment in the evening, after work. (RT 2295.) She walked

— 4 —

in and sat by him; she said he felt cold.  She walked to the bed,
took her clothes off, and called to him; she said he was shaking and
asked what was the matter.  He told her he was going to kill himself
she said "No, you're not".  He said, "Yes, I am", took the gun from
behind his back and shot her several times.  Then he put the gun to
his head and closed his eyes and squeezed the trigger, but the gun
did not go off (RT 2296-2297), so he got a large kitchen knife and
tried to push it into his heart.  It did not go in far enough, so he
tried another knife.  There was blood all over; he thought he had
pierced his heart and he collapsed near Tracy.  Then he heard her
say something; and, thinking she was still alive, he went to the
store across the street to try to get help for her.  He told them to
go help Tracy, to try to save her.  (RT 2298-2299.)  He did not want
them to save him.

A police officer, who rode to the hospital with Appellant
in the ambulance, testified that, as Appellant was placed in the am-
bulance, he asked whether Tracy was dead.  On the way to the hospi-
tal, he pleaded with the ambulance attendant to let him die, stating
"I killed my girl.  Please let me die.  I stabbed myself in the hear
and still did not die".  In the emergency room at the hospital,
Appellant stated several times, "I shoot her, so I have two bullets
to kill myself", and, "Tracy, my darling, I love you".  (RT 788-791.
He told the officer that his relationship with Tracy had broken up
in February, but that they had agreed to see each other on weekends.
She had come the weekend before the shooting, but had missed the two
weekends before that because she was seeing another man.  Appellant
stated that he had decided they should die together, and said he had
left a note explaining why they should die.  (RT 796.)

The physician who treated Appellant testified that, based upon his experience in treating suicide victims, the nature of Appellant's wounds indicated this had been a genuine suicide attempt. The knife inflicted a life threatening wound, and only missed the heart by half an inch. (RT 1144, 1150.)

Appellant had been raised in Turkey, and had moved to the United States in 1973, when he was twenty-four. (RT 2235.) In California, he worked as a painter (RT 749) and converted from Islam to "born-again" Christianity. (RT 2248.)

He met Tracy Jones in 1978. He had been dating other girls, but had no serious relationships with them. (RT 2251.) He knew Christ had said to pray for what you need, so he prayed for God to send him a woman who would be his own lady, with whom to have a family; someone different from the girls he had been dating. (RT 2252.) Shortly thereafter, he saw Tracy walking down the street in San Rafael, while he was having breakfast with his employer. He remarked that she was the one he had been praying for, and he went over to her and introduced himself; then he brought her over and introduced her to his employer and she had a cup of coffee with them (RT 752-753.) Soon after that, Tracy moved in with Appellant, into his apartment, in San Rafael.

In February, 1980, Tracy's mother became ill and Tracy moved from Appellant's apartment in San Rafel, to Mountain View, to help care for her mother; she continued to visit Appellant on weekends. He testified that he became depressed; he knew that her mother needed her, but he felt he needed her, too. (RT 2263-2265.)

When she was not there, he would look for her around the apartment, as if she were there; one time, he actually saw her when

she was not there.  (RT 2267.)  After that, he saw her in other places; he would drive to places they used to go to, in his truck, and she would be with him.  He would talk to her, and she would answer.  (RT 2288-2289.)

He often contemplated suicide.  Sometimes, during such periods, he thought that if he and Tracy both died, they would be together in heaven.

On the day of the shooting, he felt very strange all day, as though he was saying goodbye to the world.  He never really decided that he was going to kill Tracy, but he was determined to kill himself and thought he probably would kill Tracy, too.  (RT 2319.)  He felt they were both going to die, but it was not something he decided.  (RT 2336.)  He testified that he was prepared to face God for what he had done; but, instead of facing God, he found himself facing the trial jury.  (RT 2301.)

Neighbors who had known Appellant and Tracy socially, while the two were living together, testified that they knew the two were in the process of breaking up, and that Appellant seemed very sad and depressed.  (RT 735, 1191, 1192.)  He had mentioned suicide.  (RT 745.)

The day before the shooting, a neighbor saw Appellant sitting on the concrete step in front of his apartment, very upset, nervous and shaken up.  His hands were shaking.  (RT 824, 832.)  He said it was breaking his heart that Tracy was leaving him, and that he would never get over it.  He cried.  (RT 825, 832.)  He said he was thinking of killing himself; he once said that maybe he would kill Tracy, too; but then, immediately, added that he could never hurt anybody by doing such a bad thing.  (RT 826.)  Appellant's

- 7 -

relatives testified that they had noticed similar unusual behavior.
Shortly before the day of the shooting, he was very depressed.  He
said he could not live without Tracy.  (RT 1164-1165.)

On the morning of the day of the shooting, Appellant told
his sister-in-law that he wanted to kill himself; he asked her what
his mother would do.  He did not mention any intention or desire to
kill Tracy.  He was having trouble talking, and he was crying.  He
said the next world would be better.  (RT 1165-1166.)

Appellant's brother-in-law testified that Appellant had
seemed deeply in love with Tracy, and she seemed to love him.  In
February, when Tracy moved to Mountain View, Appellant underwent a
big change.  He seemed perfunctory, distracted and tense; he would
not respond to people.  (RT 1240.)

A close friend of Appellant testified that about two weeks
before the shooting, Appellant came to stay with him.  He was ex-
tremely said and depressed about Tracy leaving him; he said he could
not live without her, and the things in his house that reminded him
of her were driving him crazy.  He said life was worthless without
her.  (RT 1204-1205.)  At that time, Appellant did not seem normal.
He did not seem to know what he was talking about, and would change
subjects from second to second.  (RT 1205.)

After the shooting, while in custody at Ross General Hospi
tal, Appellant stole a razor with which to commit suicide; but, the
deputy assigned to guard him, took it away from him.  (RT 1184, 2307
He asked the deputy whether the deputy would get in trouble if he
grabbed the deputy's gun and shot himself.  (RT 1187.)

According to personnel at the Marin County jail, Appellant
exhibited paranoid behavior after being transferred there from the

hospital.  He was convinced the police were going to kill him.  He was afraid he would be poisoned when they brought him his meals.  (RT 1219-1221.)  He once asked a deputy how Tracy was; the deputy replied that she was dead.  Appellant did not mention the subject again.  (RT 1223.)

Janet Jackson, criminal justice mental health coordinator for Marin County, visited Appellant regularly in the jail, and formed the opinion that he had been psychotic on the day of the shooting (RT 1789), that he was suffering from a mental disorder and that he was in need of treatment (RT 1665).  In her opinion, the degree of depression and thought disorder Appellant exhibited indicated that his condition was not something that had happened overnight, but that it had existed for a considerable period of time before she first saw him.  (RT 1667.)  Appellant told Jackson that he was a good citizen and would obey the law and go to trial; but, that after the trial, he would kill himself.  (RT 1665.)  On another occasion, Appellant told Jackson he would not make another suicide attempt because God had refused to let him die when he tried before.  (RT 1669.)  He told her that both Tracy and God were with him in his cell, that he could see them and speak to them.  (RT 1670.)  When Jackson broke her leg playing softball, he told her he had asked God to hurt her because she had not come to see him as often as he thought she should.  (RT 1671.)  At the Preliminary Hearing, which Jackson attended with Appellant, he became so upset during the coroner's testimony that he jumped up and tried to run from the courtroom.  Afterward, he told Jackson he had intended to jump from the balcony to kill himself.  He told her that the coroner was lying, and that he should be eaten and someone should drink his blood.  He fluctuated

between tears and sobbing, raging and calmness. (RT 1674-1677.)

On June 9, 1980, Jackson and Dr. Ralph Bien decided that Appellant should be removed from the Marin County jail to Atascadero for evaluation and treatment. (RT 1682.) Dr. Bien stated that, in his opinion, Appellant was psychotic, in the sense that he was out of contact with reality. His distress seemed genuine, and Dr. Bien did not believe he was malingering. (RT 1271-1277.) Dr. Bien's working diagnosis was "situational stress reaction", suggesting a possible future diagnosis of "psychotic depression" or "brief reactive psychosis". (RT 1273.) Dr. Bien offered no opinion as to Appellant's mental state on the day of the shooting. (RT 1277.) Shortly before the trial, based upon his contacts with Appellant over a two and one half year period, his diagnosis was "psychotic depression". (RT 1337.)

Dr. Arthur Stein, chief of psychiatry at Atascadero, examined and treated Appellant in June, 1980. (RT 917-918.) He diagnosed Appellant as suffering from a major depressive disorder, with hallucinations and delusions. Appellant was psychotic. His condition could also be described as a "psychotic depressive reaction". (RT 920, 922.) Dr. Stein opined that the psychotic state began shortly after Tracy left Appellant and went to live in Mountain View. (RT 925.) In Dr. Stein's opinion, Appellant's psychosis had a definite effect on his judgment and his self-control at the time of the shooting. Due to Appellant's longstanding mental disorder, and his immediate, more seriously disturbed state, it seemed to him a logical progression of behavior to shoot Tracy and kill himself. (RT 936.)

Dr. Martin Blinder first examined Appellant in June, 1980.

- 10 -

if any, between his mental disorder and the crime charged. (RT 1349.) Dr. Gudstadt concluded that Appellant was psychotic, that his psychosis had existed for a considerable period of time prior to the shooting and that the condition was a significant factor in Appellant's behavior at the time of the shooting. (RT 1349.) In two subsequent reports, the most recent of which was prepared in April, 1982, Dr. Gudstadt reached the same conclusions. (RT 1350, 1352.) His diagnosis was "severe chronic schizophrenic psychosis". (RT 1355.)

Dr. Gudstadt stated that, on the day of the shooting, Appellant was so involved with Tracy, so dependent on her, and that his ego at that point was so defective, that in a psychiatric sense, he "merged with her". In other words, in shooting her, he was actually committing suicide, because at that point, he could not tell the difference between her and himself. (RT 1374.)

Dr. Gudstadt stated that there was no question that Appellant's psychiatric condition, and his suicide attempt, were genuine. (RT 1377, 1379.) In Dr. Gudstadt's opinion, the shooting would not have happened had Appellant not been psychotic at the time. (RT 1388.)

To rebut the defense theory that Appellant's mental illness was the cause of the shooting, the prosecution offered the testimony of an expert on Turkish language and culture, who testified that to a Turk, "honor" is an all-important concept, and that it is very bad to insult someone's honor. (RT 1938.) If a woman with whom a man is involved flirts or goes out with someone else, she brings dishonor to the man and to his family. (RT 1940.) The man may establish himself again as a "man of honor" by killing the

woman.  (RT 1944.)  However, two defense witnesses rebutted this testimony.  (RT 2349-2356, 2215-2223.)

To rebut the defense psychiatric testimony, the prosecution produced Dr. Willard H. Pennell.  Pennell, who had not personally examined Appellant, based his opinions upon the other doctors' reports, and the police reports and other materials that had been made available to him.  (RT 1991.)  In Pennell's opinion, Appellant was not psychotic, but merely "depressed".  He was not out of touch with reality, not unable to draw reasonable conclusions and not schizophrenic, although he, perhaps, did have some hallucinations and delusions.  (RT 1994.)  Pennell conceded that he did not believe Appellant's mental condition was feigned, but opined that it was not psychosis.  (RT 2022.)

In surrebuttal, Dr. Blinder testified that Dr. Pennell was traditionally biased toward the prosecution and who generally tended not to detect much in the way of mental disability or disorder. (RT 2273.)

In further rebuttal of the defense psychiatric testimony, the prosecution offered Dr. Lee Coleman's testimony.  Dr. Coleman stated that psychiatrists have no special tools with which to form opinions on the questions that are typically put before them in the courtroom and that lay persons' opinions would be equally valid. (RT 2058.)

### B.  FACTS PERTAINING TO JUROR MISCONDUCT.

On Tuesday, April 10, during jury deliberations, the trial court notified counsel that it had ordered the jury to suspend deliberations, in light of a message received from the county law librarian, indicating that a woman, identifying herself as a juror in

- 13 -

SENTENCE EXPIRED! TURKISH PRISONER HELD-HOSTAGE
IN THE CALIFORNIA STATE PRISON!
FIKRI BAYRAMOGLU, #C-54604
CTF-C-ZW-329L - P.O. BOX 689
SOLEDAD, CA 93960 USA

Board of Parole Hearings
International Prisoner Transfer Unit
1515 "K" Street, Suite 600                    August 10, 2006.
P.O. BOX 942883
Sacramento, CA 94283

RE: SCHEDULED BPT HEARING OF SEPT. 2006. PREVIOUS BPT HEARING SEPT. 16, **2002.**
REQUEST FOR STATUS OF THE APPLICATION FOR THE U.S.-TURKEY PRISONER TRANSFER TREATY
DATED: **JAN.** 29, 2006, SUBMITTED PER REQUEST OF THE TURKISH EMBASSY/ATTORNEY MS. GOKCE
SU GULLEROGLU (APPOINTED BY THE ANKARA BAR ASSOCIATION TO REPRESENT I/M BAYRAMOLGU
FOR HIS TRANSFER IN TURKEY) REFUSAL TO APPEAR BEFORE THE BPT FOR THE SCHEDULED BPT
"PAROLE SUITABILITY HEARING" BECAUSE, IT'S NOT APPLICABLE AND IRRELEVANT ACCORDING
TO ABOVE NOTED TREATY, AND ATTORNEY MS. GULLEROGLU & ATTORNEY MR. RICHARD D. ATKINS
BOTH ARE SPECIALIST IN INTERNATIONAL PRISONER TRANSFERS. THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT CURRENT CASE NO.: 06-73187.

1.    The first application for transfer was submitted on Dec. 16, 1999. Turkish
Embassy, on Aug. 16, 2000 & 2001, formally requested my transfer from the BPT as well
as the U.S. Dept. Justice, International Prisoner Transfer Unit.

2.    After these above noted developments, too much time went by, so I've started to
write letters to the BPT and to the U.S. Dept. of Justice, in an effort to have them
decide whether I'll be transfer or not. However, the BPT refused to respond to my let-
ters, and gloss-over, rubber-stamped denied all of my CDC/BPT appeals in the matter of
my transfer, including my Petitions for a writ of H.C. were all DENIED!

3.    Finally, on Sept. 16, 2002, I had to appeared before the BPT hoping that they'll
decide whether I'll be transfer or not. At the hearing: INMATE BAYRAMOGLU: "This is
not a "suitability hearing. I'm not asking to be paroled. I'm asking to be transfer to
my country." COMMISSIONER LAWIN: "Sir, you don't seem to understand that this **Panel**
has no authority to grant transfer." ATTORNEY DAVID SPOWART: "I think the Board of
Terms has the power to send him to Turkey."

4.    "..**Panel** has no authority to grant transfer?" The BPT in Sacramento refusing to
decide as noted above (#2), you're claiming no "authority," who's supposed to decide?
I think that was nothing but a run around, hiding behind the bush, and violations of
the Government Code Section 12012.1. CCR Title 15 Section 2403, Penal Code Sections
5028/2912(a)(b)(1)(2), 2911(e), 3000(a), 1168. (Prohibits sentencing court from fixing
term or duration of confinement.) See CCR Title 15 Section 2403 (c) "Base Term."

5.    COMMISSIONER LAWIN: "Officer could you take him!" Ordered the I/M Bayramoglu
out of the Board-room, behind his back, **"within -3- minutes"** denied his transfer -4-
more years, this, after serving for almost "quarter of century" for his -15-years-to-
life-sentence for a "true crime of passion" without any prior criminal history, and
near "model inmate record" prior to CDC misconduct for the "BOGUS" charge/conviction
of possession of I/M manufactured weapon, claimed to be discovered by an "Hostile
Officer" who Bayramoglu has "minor documented problem" with, "underneath" the Bayram-
oglu's locker, during a "previously announced search" in a common area, which was
very easily accessible to -300- other inmates, 24/7! I'm I GUILTY? You decide!
Bayramoglu was found guilty, assessed 365 days loss of credits, and -10- months in
the "Notorious Corcoran SHU" where the guards set-up fights between the inmates, so
that they'll have an excuse to shoot and kill the inmate they don't like. "The nation's
most deadly state prison!" According to Sacramento, Bee.

Board of Parole Hearings
International Prisoner Transfer Unit
RE: Scheduled BPT Hearing of Sept. 2006.

7.    While in the Ad/Seg. for that "Bogus" charge/conviction of I/M manufactured weapon, Bayramoglu had a "physical altercation" with his cell-mate, whom admitted in writing, and took full responsibility for the fight, of course, I/M Bayramolgu once again, found guilty, and assessed "90 days loss of credit, and -10- days DD."

8.    "After the hearing," the administration elevated the "Physical Altercation" charge to "Battery on an Inmate with Great Bodily Injury" and added -15- more months SHU Term to his -10- months SHU Term for that above noted "BOGUS" charge/conviction of I/M manufactured weapon! Bayramolgu believes just because he very strongly accused C/O D. Denny for set him up for that BOGUS weapon charge.

9.    The reader should take notice that if Bayramoglu was not set-up for that BOGUS weapon charge, he would not be in the Ad/Seg. Therefore there would not be no cell fight and additional -15- more months SHU Term!

10.    Bayramoglu's appeals throughout CDC and state courts were just gloss-over, rubber stamped DENIED! The SHU Term declared "illegal" in the federal court. RE: Director Level Decision Case NO.: 9403327 Dated: Aug. 27, 1997.

11.    While serving the "illegal SHU Term" Bayramoglu had to appeared before the BPT in shackles. In the "sick minds" of the BPT I/M Bayramoglu was guilty of that "BOGUS" I/M weapon charge, guilty of that -15- months "illegal SHU Term" and guilty of the CDC 115's that he was "forced" to recieved while serving that "illegal SHU Term" in the "Nation's most deadly state prison," the American Gladiator School!

12.    July 25, 1995 BPT Hearing: COMMISSIONER GILLIS: "Just briefly, yes. I would have opted for years. You had three serious disciplinary violations...I think you're going down hill, you're committing serious violations, and I just think it should have been a four year denial." INMATE BAYRAMOLGU: "Can I get transferred to go back to my country to do my time over there the remaining three years?" COMMISSIONER GILLIS: "You have to be found suitable first." INMATE BAYRAMOGLU: "I thought it is s federal treaty that I could transferred to my country." PRESIDING COMMISSIONER BAKER: No. Not until after you're found suitable." COMMISSIONER BAKER: Also said: "You're going to have to learn how to played the game by our rules, if not you're going to die in prison!."

13.    After the hearing, all shackled-up, they put my face up against the wall! There prayed: "God, they did it to me, I pray to you that you do to them as they deserve!" Later on, I've found-out that Mr. Baker dropped dead! Even though, he was the one who wished me DEATH! (Be careful what you wish for. You may get it!). That was the most "evil, unjust" BPT Hearing that I've ever had!

14.    I must be found suitable first before a transfer can be approved, according to BPT Commissioner Gillis & Baker, and other BPT Commissioners. This is contrary to the Treaty between the U.S. & Turkey, and contrary to the belief of my above noted Attorney Ms. Gokce Su Gulleroglu, & Attorney Richard D. Atkins, who specializes in International Transfers. There exist a documented proof that this Board has granted/approved transfers to some inmates without being found suitable for parole first. I/M Mikeal Schoild, CDC #D-31112, is only one such a proof. These facts, are brought to the attention of the above entitled Court.

15.    The parole suitability is also not applicable in my case as well. Because, suitability is to determined whether the individual is fit to go back into society. I'm not from this society, and I'm not an American citizen, nor did I came into U.S. to make it my home or my country. I'm a citizen of the Republic of Turkey, and my Govern-

-2-

ment have requested my transfer, and now all I want to do is to go back HOME!
Is that too much to ask? I was sentenced to -15-years-to-life, not "without the pos-
sibility of parole!" My minimum/maximum release dates were: April 19, 1990 & Jan.
25, 1994! I've served more time than some of the cold-blooded, dispassionate murderers
that you've already granted parole/transfers! Why not me?

16.   You're also responsible for the those above noted trump up charges, because,
you, you, you reviewed/used against me to deny my transfer/parole, and continued to
reviewed/used against me to the present day! Those "BOGUS" charges are still in my
file! In fact, Ms. M. Rubio, CCI in her Memo Dated: Dec. 16, 1999, attached to my
above note application for transfer she wrote in part: "He was placed in Administra-
tive Segregation on 11-10-93 and received a 10 month SHU term for Possession of a
15 month consecutive SHU term for Battery on an Inmate with Great Bodily Injury!"

17.   Terry Brayer, Facility Captain, (One of the most stupid, incompetent idiot, who
caused me so much grief, and problem with my Turkish Consul in L.A.) in his letter
of July 26, 2000, to the Turkish Consul, told him bunch of lies, and displayed groos
incompetence and ignorance of my legal situation! If you do not know your issues, never
seen me, or reviewed my file, why are you sticking your shitty nose into my legal
matters, and causing me so much grief, you stupid idiot!

18.   After the CDC&R "Informational Bulletin" Dated: Dec. 29, 2005. SUBJECT: "Foreign
Prisoner Transfer Program" that stated in part: "Anytime a foreign national inmate
requests to apply for FPTTP Transfer and application for transfer a "NEW CCDR 8021"
be submitted for processing." On March 14, 2006, I've wrote a letter to Mr. Lazaro,
as suggested in that "informational bulletin" and requested "...my application "pro-
perly processed" without erroneous/inflammatory information from the CTF and the
Turkish Embassy." Of course, as of today, no response.

19.   On 11/2/2005, I've appeared before the UCC for annual review. I've brought the
above noted "Bulletin" to their attention, and requested "new CDCR 8021" be submitted
without those bogus, trump-up charges, and seeked my so called counselor's assistance
for job assignment, instead, they all gang-up on me, told me to "Get out of here! Burn
rubber,"and behind my back, wrote me a very inflammatory CDC 128! Next day, on Nov.
3, 2005, I've wrote a letter to the Warden, and brought everything to his attention
and sought his assistance, of course, he didn't even respond to my letter.

20.   On November 19, 2005, I've filed a "MOTION FOR INJUNCTION FOR THE CONSTANT VIO-
LATIONS OF THE DIRECTOR LEVEL "AMENDED DECISION" CASE NO.: 9403327 THAT CAUSED PETI-
TIONER CONSTANT DENIAL OF PAROLE/TRANSFER PURSUANT TO U.S.-TURKEY PRISONER TRANSFER
TREATY,.." On Jan. 10, the U.S. Dist. Crt. (ED) CA Case NO.: CIV-S-96-2152-LKK-GGH P
(Where the SHU term declared "illegal!") issued an Order that forwarded the matter
to the USCA Ninth Circuit, Case NO.: 06-73497. If the reader would like to see/read
"true prison very well documented "legal nightmares" this is the document to read!
Other very well documented legal nightmares are stated in Bayramoglu's letter of June
5, 2006, attached to his motion dated "666" filed in the USCA for the Ninth Circuit,
Case NO.: 06-73187. Currently pending.

21.   For the politics of the "Exporting foreign prisoners makes sense" see attached
article dated April 21, 2003, by the San Francisco Chronicle. It seems like there's
"collective, conspiratorial effort on the part of the CDC/BPT in an effort to discour-
age/deny foreign transfers!" On Aug. 6, 2006, Bayramoglu, wrote a letter to the Honor-
able John Hager, "Special Master" of the U.S. Dist. Crt. (ND) of California, and

Board of Prison Terms
International Prisoner Transfer Unit
RE: Scheduled BPT Hearing of Sept. 2006.

brought this matter, and others to his attention for review/investigation and appropriate action. In an effort to demonstrate further "collective, conspiratorial effort on the part of CDC/BPT to discourage foreign prisoner transfers, reader may take notice that Bayramoglu's BPT appointed Attorney David J. Spowart, for the BPT hearing of Sept. 16, 2002, did not know anything about the Bayramoglu's desire to go back home, and Turkish Embassy's formal requests for his Transfer. The so called "parole package" prepared and given to Attorney Spowart by the C&PR Ms. D. Lavorse, did not contained not a single one document about the Bayramoglu's trasnfer!

22.  I/M Bayramoglu is refusing to have Mr. P. Taporco CCI to submit his BPT report for his above scheduled BPT hearing for his actions/omissions noted in the CDC 602 stamped "RECEIVED" Dec. 4, 2003, by the CTF Apls. Cor. Also for his refusal for "NEW CDCR 8021" for his transfer. Mr. Taporco also refused to assist I/M Bayramoglu for job assignment, or return of his red privilege card. He told Bayramoglu that: "I got everything. All I need is parole plans." What parole plans? I've an active INS hold and I must be deported, and I want to go HOME! He said: "You've no INS hold, you're not going anywhere." This despite the fact that on April 10, 2006, wrote a letter to my Attorney Ms. Gulleroglu, that stated in part: "In your letter of 09/12/2004, you wrote in part that my brother Ufuk "...will give guarantee in front of Notary Public that he'll give all the support for your living in Turkey which also covers all financial help for you to stand in Turkey. We managed to sent this commitment to BPT to be filed also to the related institutions for your transfer to Turkey." See Bayramoglu's letter to Ron Frantz, dated Jan. 29, 2006, attached to application for transfer.

23. I've served the copy of this letter to Ms. Taporco, and requested his assistance for making sure that the BPT has received the above noted "Notarized Support" from my brother for my living in Turkey. Mr. Taporco denied receiving this letter, and refused to contact BPT in the matter. Furthermore Mr. Taporco does not conceal his bias that "All lifers belongs in prison!" This man will not make my Board Report, PERIOD!

24.   The Psychological Evaluation for the BPT Hearing of Sept. 16, 2002, prepared by M. Carswell, Ph. D. Stated in part: "...his lack of assuming responsibility and lack of true remorse for his commitment!" I'll let the facts and the nature of my commitment offense speak for itself for now. However, at the BPT hearing, Attorney Spowart in response said in part: "...there has been talk about...no remorse, no this...He kill her, and then tried to kill himself. Now, tell me, does that show remorse or not? I think it's the ultimate remorse!" There's no doubt in Bayramoglu's mind that this bias woman, so called examiner have committed sin and crime against this inmate with her lies and her total disrespect for the facts in the file!

25.   The physician who treated Bayramoglu testified that, based upon his experience in treating suicide victims, the nature of Bayramoglu's wounds indicated this had been a genuine suicide attempt. The knife inflicted a life threatening wound, and only missed the heart by half an inch!" How's that for an ULTIMATE REMORSE!

26. Psychiatrist Dr. Gudstadt, appointed by the Court stated in part: "In other words, in shooting her, he was actually committing suicide, because at that point, he could not tell the difference between her and himself!" How's that for an ULTIMATE REMORSE! Dr. Gudstatd further stated that: "...there was no question that Bayramoglu's psychiatric condition, and his suicide attempt, were genuine. In Dr. Gudstatd's opinion, the shooting would not have happened had Bayramoglu not been psychotic at the time."

Board of Prison Terms
International Prisoner Transfer Unit
RE: Scheduled BPT Hearing of Sept. 2006.

Board Commissioner Ms. M. O'connell, Deputy Public Defender Gaile O'connor and many
other court professionals felt that his was a case of a manslaughter. Gaile O'coonor:
"The case is not a murder case Your Honor!" Janet Jackson, criminal mental health
coordinator for Marin County, and Arthur Stein Chief of Psychiatry at Attascadero,
examined and treated Bayramoglu in 1980, all reported/testified that Bayramoglu was
"...suffering mental disorder...major depressive disorder, with hallucinations and
delusions, and that Bayramoglu was psychotic at the time of the incident!" NOTE:
These facts were taken from the Bayramolgu's "Opening Brief" filed in the United
States Court of Appeals for the Ninth Circuit Case NO.: 85-2862, were all available
to so called psychologist M. Carswell, however, were all ignored by her. It's apperant
that she has no respect for the facts in the file, she cannot be trusted! It's impos-
sible for this inmate to receive impartial report from these "bias state agents!"
For more facts, "Pertaining to the Incident" the reader may cite: Bayramoglu v.
Estell, 806 R 2nd 880 (9th Cir. 1986).

27. I/M Bayramoglu in his letter of May 18, 2006, to Verna A. Adams, Judge of the
Superior Court of Marin County, wrote in part: "I've reviewed the copy of the "EXECU-
TIVE REPORT ON PAROLE REVIEW DECISIONS FOR THE STATE OF CALIFORNIA, DECISIONS FOR THE
PERIOD November 17, 2003 through December 31, 2004, BY GOVERNOR ARNOLD SCHARZENEGGER."
In my review, I could not find any second degree homicide, "crime of passion" that any
inmate had more mitigating circumstances, and have served more time for the crime than
this Petitioner. MY minimum/maximum release dates were: April 19, 1990 & Jan. 25, 1994!
I/M Rghbir Sibgh, stabbed his wife 20 times, killing her, right front of their -4- years
old son, such a "brutal crime" and served 6 years or so less than this prisoner, and
yet, was granted parole by the BPT said, Governor's "Executive Report..." I wonder,
Psychologist Ms. M. Carswell made his Board Report, and what she said about his "remorse"
My friend Earni Smith #C-23003, he practically executed his wife, and was sentenced
to -17-years-to-life (not -15-) and the victim died in her mother's arms! He was gran-
ted parole in 2003. after serving -23- years or so. As I've stated above (#15), this
Board treated me worst than "cold-blooded murders." Granting their paroles/trans-
fers with such a "brutal, cold-blooded, dispassionate murders" after serving lot less-
time served, sometimes, -10- years or so less-time served than this inmate!
28. None of these cold-blooded, dispassione murderers turned the weapon to them-
selves after murdering their victims in right front of their mother's and son's, and
none of them survived a "genuine suicide attempt" like this inmate, and did not have
have half of dozen court appointed psychiatrists testified that the "...shooting would
not have happened had Bayramoglu was not psychotic at the time." No man, you've no
moral or any legal justification to deny my parole or transfer after granting the
parole/transfer of individuals convicted of such a brutal crimes!
29. Therefore, the question before the BPT is not whether I/M Bayramoglu is "suitable
for parole," that's inapplicable & irrelevant, but rather, "did we made him suffered
enough for what he has done?" When the answer is yes, just put me in a plane and send
me back to my country, my home, where I naturally belong! You don't have to see me, we
have nothing to say to each other anymore. Enclosures: BPT "DECISION PAGE -3-
Dated: 7/25/1995.  S.F. Chronicle Article Dated: 4/21/2003.
Attorney Richard D. Atkins' letter of Oct. 19, 2000. -2- Pages. CDC "AMENDED DECISION"
Copy of letter dated 8/6/06, to Hon. John Hager, Special Master, U.S. Dist. Crt. (ND) CA,
CC: USCA NINTH CIR. NO.: 06-73187. Hon. John Hager, Special Master.
Turkish Embassy, W.D.C. American Embassy, Ankara
Attorney Ms. Gocke Su Gulleroglu, Ankara.
NOTE TO: "ALL TURKISH & AMERICAN WRITTEN & BROADCAST NEWS AGENCIES:" If you need any
supporting evidence/exhibits, please contact above noted Courts & I/M Bayramoglu.
CC: Attorney David Spowart.       Thank you,

FIKRI BAYRAMOGLU/PETITIONER

38

1       PRESIDING COMMISSIONER BAKER:  Are there any

2   comments, Mr. Gillis?

3       COMMISSIONER GILLIS:  Just briefly, yes.  I

4   would have opted for four years.  You had three

5   serious disciplinary violations.  Unfortunately there

6   were some others who didn't think you should get that

7   much, but I think you're going downhill, you're

8   committing serious violations, and I just think it

9   should have been a four year denial.

10       INMATE BAYRAMOGLU:  Can I get transferred to go

11   back to my country to do my time over there the

12   remaining three years?

13       COMMISSIONER GILLIS:  You have to be found

14   suitable first.

15       INMATE BAYRAMOGLU:  I thought it is a federal

16   treaty that I could be transferred to my country.

17       PRESIDING COMMISSIONER BAKER:  No.  Not until

18   after you're found suitable.  And if you have any

19   problems trying to figure that out, you can talk to

20   your attorney and he might be able to explain it to

21   you.

22       The time is 10:10, and that concludes the

23   hearing.

24                    --oOo--

25   PAROLE DENIED FOR THREE YEARS

26   EFFECTIVE DATE OF THIS DECISION        NOV 3 0 1995

27   FIKRI BAYRAMOGLU  C-54604    DECISION PAGE 3    7/25/95

SAN FRANCISCO CHRONICLE

APRIL 21, 2003.

# Exporting foreign prisoners makes sense

*By Lewis Dolinsky*

For nearly two decades, European diplomats stationed in California have tried to get their citizens transferred from state prisons to prisons in their homeland. Inmates are more easily rehabilitated if they are able to speak their own language, receive visits from family and friends and learn a trade useful in the country in which they will be released. Many of them will be deported to Europe ultimately; better to know where they are and when they will be out.

The consuls general of Los Angeles and San Francisco did not invent this idea: It was established by the 1983 Strasbourg Convention on Sentenced Persons. Voluntary rather than compulsory, this treaty is honored by the U.S. government in spirit and in practice.

The inmate, the receiving country and the sending country all have to agree to the transfer, and the feds are careful whom they send abroad. Are the inmates really foreign citizens? Do they speak the language of their homeland? Are families and friends here or there? Are the prisoners dangerous? Differences in terminology and sentencing must be dealt with (although some countries do carry out the original sentence rather than adjust it under their own laws).

Even though the process is cumbersome, the Justice Department repatriated 305 inmates from the federal prison system last year (and received 99 Americans) under the Strasbourg Convention and other international and bilateral transfer treaties.

But most of America's 2 million prisoners are in state institutions, and several states refuse to transfer; the rest do so rarely. Their attitude is: We didn't sign the treaty. They also fear that sentences will be shortened, or that foreign prisons won't be as unpleasant as ours. The states are more interested in punishment and vengeance than in rehabilitation and reintegration. International relations are not their concern.

From one of the largest prison systems in the world (about 160,000 inmates), California transferred two foreign prisoners last year, neither of them European. According to its records, California has transferred 17 prisoners in its history, only three European. By contrast, the Netherlands transferred 64 prisoners last year from its small system; Britain transferred 50. Our neighbor Canada eagerly transfers prisoners. Mexico will transfer almost any American who is willing, and the Justice Department will accept almost any American from Mexico.

European frustration grew as diplomats were stonewalled by the California Board of Prison Terms. Swedish Ambassador Rolf Ekeus, the first leader of U.N. arms inspections in Iraq, tried to meet with Gov. Gray Davis but was rebuffed. When the Legislature held a joint "informational hearing" in 2001 on California's foreign prisoner transfer program, bureaucrats seemed ill-informed and defensive.

Last year, state Sen. Betty Karnette, D-Long Beach, sponsored legislation to mandate prisoner transfers if the sentence would be substantially carried out. Davis vetoed the bill. By then, it was clear that the impasse was symptomatic of a larger problem.

Through tough sentencing laws, a hard-line parole board and huge numbers of drug-related convictions, the state prison population had kept increasing long after crime leveled off. The governor's ties to the prison guards' union have become well known. Already the best-paid in the country, the guards received a huge raise just before contributing $251,000 to the Davis re-election campaign last year. The prison industrial complex includes building and servicing institutions.

But a state budget shortage in 2002 became a catastrophe in 2003.

Cutting the budget, not humanitarianism, is the selling point for prisoner transfers. If the state penal costs are $27,000 per prisoner, exporting some of them could save millions of dollars (as the federal government does). California has hundreds of European prisoners and more than 17,000 Mexicans. Mexico limits the number it will take back. But Frank Zimring, a professor at UC-Berkeley's Boalt Hall School of Law, suggests that California offer to subsidize the incarceration of prisoners it ships back to Mexico; the state would still save.

Karnette has reintroduced her prisoner transfer legislation. More enlightened people are now in charge of the prisoner transfer program in California, and a few transfers are said to be in the pipeline. Intentions are good: results are better.

## Learn more

*The Commonwealth Club is sponsoring a panel discussion on California's history on foreign prisoner transfers. Experts will consider the benefits and limitations of the transfers, as well as the political and budgetary fallout of California's policy.*

**When:** April 28, noon-1:30 p.m.

**Where:** 595 Market, 2nd floor, San Francisco

**Admission:** Free

**Reservations:** (415) 597-6705 / (800) 847-7730

**Web site:** www.commonwealthclub.org

---

*Lewis Dolinsky, a former editor and foreign affairs columnist at The Chronicle, will moderate a panel discussion on prisoner transfers next week at the Commonwealth Club in San Francisco (see box).*

RICHARD D. ATKINS
ATTORNEY AT LAW
1429 WALNUT STREET
8TH FLOOR
PHILADELPHIA, PA. 19102
USA

(215) 977-9982
FAX (215) 564-2859
EMAIL: DICKATKINS@AOL.CC

October 19, 2000

Fikri Bayramoglu
C-54604
CTF-Central Y 315
P.O. Box 689
Soledad, CA  93960-0689

Dear Mr. Bayramoglu:

That was the longest two pages I ever read in my life. You have lots of issues.

First, California is one of the worst states in transfers. It is true that the California authorities refuse transfers virtually all the time. That may change with the forthcoming state administrations. Also, we are presenting a session at the American Correctional Association Meeting next summer in order to help change their minds.

It is true our Justice Department (OEO) does not transfer unless the state approves. That's the way it is, unfortunately.

, Some states allow transfer regardless of what the parole board authorities or Board of Prison Terms says. It isn't necessary to be approved for release on parole, in order to be approved for a transfer.

Also, the authorities totally ignore the ridiculous contradiction that it's okay to deport at the end of the sentence, but you cannot be transferred if you have lived here for the preceding five years. But that's what they do (I.N.S. rules versus transfer rules). It may be stupid but that is what is in effect.

I ~~think~~ think your attorney wanted to see if you would trade your lawsuit for transfer. But I saw nothing that showed it was really offered by the state.

I am sorry that I can't offer you a sure way of getting back to Turkey in the immediate future. Whatever you are going to do legally try to show the best possible behavior so you may

Fikri Bayramoglu                          - 2 -                    October 19,
2000
C-54604

possibly be released at your next consideration in 2002.

Good luck.

Sincerely yours,

Richard D. Atkins

RDA/lc
enclosure

P.S. I am enclosing your materials in case you don't have copies.

SENTENCE EXPIRED! "FORGOTTEN MAN!"
TURKISH HELD-HOSTAGE IN THE CALIFORNIA
STATE PRISON, DENIED TRANSFER "WITHIN -3-MINUTES"
PURSUANT U.S.-TURKEY PRISONER TRANSFER TREATY.
FIKRI BAYRAMOGLU, #C-54604
CTF-C-ZW-329L - P.O. BOX 689
SOLEDAD, CA 93960  USA

August 6, 2006.

The Honorable John Hager, Special Master
United States District Court, (ND) CA.
450 Golden Gate Avenue, 18th Floor.
San Francisco, CA 94102-3283

Before: The Honorable John Hager, Special Master:

The following issues are brought to the attention of this Honorable Special Master for review/consideration, and appropriate action.
ISSUE #1. U.S.-TURKEY PRISONER TRANSFER TREATY. THIS COURT CASE NO.: C 02-2553 VRW (PR) (FOREIGN PRISONER TRANSFERS) ALSO PLEASE SEE ATCH. "MOTION FOR ORDER THE RESPONDENT TO FILE ANSWER, AND MOTION FOR AN EVIDENTIRAY HEARING; AND MOTION FOR SUBPOENA/DUCES TECUM CDC/BPT TURKISH EMBASSY/CONSULATE OFFICIAL BASED ON THE FACTS/MISCONDUCT NOTED IN THE "ADDENDUM" AND IN THE "NOTICE OF LAWSUIT" BOTH DATED: DEC. 26, 2005. MOTION FOR APPOINTMENT OF COUNSEL, AND DECLARATION OF INDIGENCE." FILED: APR. 21, 2006, IN THE U.S. DIST. CRT. (ND) CA. NO.: C 06-2249 VRW (PR) ALSO ATCH. BAYRAMOGLU'S SECOND APPLICATION FOR TRANSFER, AND HIS LETTERS TO THE BPT/U.S. DEPT. OF JUSTICE, INTERNATIONAL PRISONER TRANSFER UNIT, DATED: JAN. 29, & MARCH 21, 2006. AS OF TODAY, NO RESPONSE. FOR MORE CDC/BPT "LEGAL NIGHTMARES" PLEASE REVIEW ATCH. "MOTION FOR INJUNCTION..." U.S. DIST. CRT (ED) CA. NO.: CIV-S-96-2152-LKK-GGH P. ORDER FILED: JAN. 10, 2006.
ISSUE #2. WHETHER CDC&R HAS ANY LAW OR GOD GIVEN RIGHT TO DENY INMATES "CREDIT EARNING ASSIGNMENT INDEFINITELY?" MORE DETAILED INFORMATION, PLS. SEE ATCH. PETITION FOR A WRIT OF H.C. FILED: JULY 31, 2006, IN THE SUP. CRT. OF CA. CO. OF MARIN, CASE NO.: SC-148826A. ISSUE #3. WHETHER I/M BAYRAMOLGU, WAS A VICTIM OF "BOGUS" CHARGE/CONVICTION OF I/M MANUFACTURED WEAPON, CLAIMED TO BE DISCOVERED BY AN "HOSTILE OFFICER, DURING A PREVIOUSLY ANNOUNCED SEARCH, "UNDERNEATH" OF BAYRAMOGLU'S LOCKER, IN A COMMON AREA (DORM LIVING) WHICH WAS VERY EASILY ACCESSIBLE TO -300- OTHER INMATES, 24/7!" BAYRAMOGLU DECLARES UNDER THE PENALTY OF PERJURY, UNDER THE LAWS OF THE U.S. AND BEFORE THIS SPECIAL MASTER, THAT HE IS A COMPLETELY INNOCENT VICTIM IN THIS MATTER. FOR MORE DETAILED FACTS PLS. SEE ATCH. "REQUEST FOR RECONSIDERATION OF THE ORDER DENIED PETITION..." RECEIVED BY THE CRT. SEPT. 23, 2004, U.S. DIST. CRT. (ED) CA. NO.: CIV-S-96-2152-LKK-GGH P. AND "MOTION FOR ORDER THE DISTRICT COURT TO RECONSIDER THE ORDER THAT ERRONEOUSLY DENIED PETITION..." FILED/DATED: JAN. 16, 2006. USCA NINTH CIRCUIT.
ALSO ENCLOSED FOR THE HON. SPECIAL MASTER'S REVIEW, "MOTION FOR ORDER THE DISTRICT COURT TO GRANT THE PETITION/DEPORTATION PURSUANT TO U.S.-TURKEY PRISONER TRANSFER TREATY FORTHWITH" DATED: "666" U.S. DIST. CRT. (ND) CA. NO. C 06-2249 VRW (PR) USCA NO.: 06-73187. (PENDING) BAYRAMOGLU SOUGHT THE ASSISTANCE OF HIS REPRESENTATIVE U.S. SENATOR MS. DIANE FEINSTEIN & MS. BARBARA BOXER, CALIFORNIA "STATE SENATE" SENATOR MS. BETYY KARNETTE, IN THESE ABOVE NOTED MATTES, HOWEVER, ALL REFUSED TO ASSIST HIM. ENCLOSED COPIES OF HIS LETTERS DATED: MARCH 26 MAY 31 & MARCH 21, 2006. FOR BRIEF STATE COURT NIGHTMARES, PLEASE REVIEW ATCH. "MOTION FOR ORDER TO SHOW CAUSE..." IN THE SUPREME COURT OF THE STATE OF CALIFORNIA, CASE NO.: S133211. BAYRAMOGLU RECEIVED A LETTER FROM THE GOVERNOR'S CONSTITUENT AFFAIRS OFFICE" IN RESPONSE TO HIS TRANSFER ABOVE NOTED "ADDENDUM (SUP. CRT. OF CA. NO.: S133211) DATED: JUNE 14, 2005, HOWEVER, SINCE THAT TIME, NO RESPONSE FROM THE GOVERNOR'S OFFICE.

Petitioner is truly in a legal nightmare, and respectfully requests this Honorable Special Master to take appropriate action in these above noted matters. Petitioner sincerely believes that he has "served, finished" his sentence, and he's very, deeply sorry for what he has done, and now that all he wants is to go back home!

Respectfully submitted,

FIKRI BAYRAMOGLU/PETITIONER

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONAL AGENCY                    PETE WILSON, Governor

# DEPARTMENT OF CORRECTIONS
P.O. Box 942883
Sacramento, CA   94283-0001



August 27, 1997

Bayramoglu, C-54604
Mule Creek State Prison
P.O. Box 409099
Ione, CA  95640

RE:  DIRECTOR LEVEL DECISION                        **AMENDED DECISION**
CASE NO. 9403327
INSTITUTION LOG NO. 94-1830 (SOL)

Upon request of the California State Attorney General's
Office, the decision rendered at the Director's Level
Review, for the cited Inmate Appeal Branch Case number,
dated March 3, 1995, was reevaluated.  Based upon this
review, it is determined that the appellant's arguments have
some merit.   The appellant was issued a CDC 115, Rules
Violation Report (RVR), log number S2-94-04-354, charging
him with violation of the California Code of Regulations
(CCR), Title 15, Section 3005, Physical Altercation.   The
original review appropriately determined that appellant was
afforded disciplinary due process per the CCR and was found
guilty by the Senior Hearing Officer based upon the
preponderance of evidence presented during the original
disciplinary hearing.   However, it was determined that the
reviewing officer inappropriately elevated the RVR from a
Division "D" offense with the specific charge of a Physical
Altercation to a Battery, without ordering the RVR to be
reissued and reheard.   Subsequently, appellant was
inappropriately assessed a 15 month Security Housing Unit
(SHU) Term, based upon the amended charge.

The institution shall remove from the cited RVR, all
reference to the amended charge of battery, and retain the
specific charge of a Physical Altercation.   The institution
shall also schedule appellant for Institution Classification
Committee review, and recalculate appellant's credit earning
status.   The institution shall document in appellant's
central file that the 15 month SHU Term was inappropriately
assessed and determine the appellant's appropriate Work
Group earning status for the period appellant was in SHU for
the cited RVR.

W. DES VOIGNES, Appeals Examiner        G. BONNIE GARIBAY, Chief
Inmate Appeals Branch                   Inmate Appeals Branch

cc:  Warden, MCSP
     Appeals Coordinator, MCSP

CTF-C-ZW-329-L - P.O. BOX 689
SOLEDAD, CA 93960  USA

December 10, 2006.

Board of Prison Terms
Decision Review Unit
1515 "K" Street, Suite 600
Sacramento, CA 95814

RE: FIKRI BAYRAMOGLU, PRISON NUMBER: C-54604
"SCHEDULED" BPT HEARING OF OCT. 26, 2006. CRIME: "CRIME OF PASSION."
CRIME DATE: APRIL 17, 1980. SENTENCE: -15-YEARS-TO-LIFE. MINIMUM/MAXIMUM
PAROLE ELIGIBLE RELEASE DATES: APRIL 19, 1990 & JAN. 25, 1994.
REQUEST FOR THE COPY OF THE DECISION AND/OR TRANSCRIPTS OF THE HEARING
"WITHIN -30- DAY" PER 2041(c)(2) & 2042.

To: Decision Review Unit:

This Prisoner refused to attend above noted hearing for the reasons noted in
his letter of Aug. 10, 2006, to the BPT. On Nov. 8, 2006, Prisoner went to so called
post board UCC. At that hearing, Mr. P. Taporco, CCI informed him that the BPT
denied his "transfer" to his home country, pursuant to U.S.-Turkey Prisoner Transfer
Treaty -4- more years. Prisoner has an active INS hold, must be deported pursuant
to 8 U.S.C. § 1101(a)(43)(A) (8 1228(c)(d)(c).

The reviewer, or the reader should take notice that this was his "third" -4-
year denial in a row, despite his spotless prior criminal history, and near "model
inmate" record prior to the CDC misconduct/nightmares he was subjected to as a result
of that misconduct. More facts in this matter, the reviewer may refer to Prisoner's
above noted letter of August 10, 2006.

The major function and fundamental legal obligation of the Decision Review Unit
under the BPT § 2042 is "...apparent inconsistency or result from results generally
obtained from the same or similar cases,...decision not supported by the evidence on
the record, or a unique or unusual policy issue posed by the proposed decision."
Prisoner requests this          Decision Review Unit not to approved the proposed decision
in gross violation of the BPT § 2042, Penal Code, and Prisoner's Due Process Rights.

The review of the "facts and the nature of the Prisoner's commitment offense,"
and time served, spotless prior criminal history; near model inmate record (as noted
above) no "Public Safety" issue at stake, (because, upon release from prison, Prisoner
will be at the other end of the world) and in comparison to "...same or similar cases,
.." other individuals have been granted parole/transfer after serving lot less time
that this Prisoner, will all show that the BPT did not have any moral or legal justi-
fication for the denial of his "transfer within -3- minutes" -4- years, "third time"
in a row. Prisoner will be serving his sentence times two, which means, -30- years!

Lot more time than the Armenian "American Terrorist" who executed Turkish General
Consul Kemal Arikan in L.A. in 1980. Lot more time than the I/M Rghbir Sibgh, who stab-
bed his wife -20- times, killing her, right front of their -4- year of son, such a
"brutal crime!" Served -6- years less time than Prisoner, and was granted parole date
by the BPT. A lot more time than the Prisoner's friend Earni Smith C-23003, he practi-
cally executed his wife by putting two bullets into her head, right front of her mother!
Earni was Ordered paroled in 2003. A lot more time than the most notorious cases of
all, the I/M R. Rosenkrantz, shot and killed a man with an "UZI-MACHINE-GUN" -10-
times, and Ordered released. The court ordered his release stated in part: "Prisoner
has now served in excess of the maximum term for both second and first degree murder!"
Please take notice that these said individuals were sentenced to -16/17-years-to-life
not -15- and none have turned the weapon to himself, after brutally murdering their
victims, and none have survived a "genuine suicide attempt" like this Prisoner! is this
Justice? You decide!
                              Sincerely,

                              FIKRI BAYRAMOGLU/PRISONER.

SENTENCE EXPIRED! "FORGOTTEN MAN!"
TURKISH PRISONER HELD-HOSTAGE IN THE CALIFORNIA STATE PRISON!
FIKRI BAYRAMOGU, #C-54604
CIF-C-ZW-329-L - P.O. BOX 689   USA

February 4, 2007.

The Honorable Jerry E. Brown
Attorney General of the State of California
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004.

RE: FIKRI BAYRAMOGLU, PETITION ON WRIT OF HABEAS CORPUS, U.S. DISTRICT COURT
(ND) CA. CASE NO.: C 06-2249 VRW (PR).

Dear Honorable Attorney General:

I am very happy that you're the Attorney General of the State of California.
I am familiar with your brilliance, and with your leadership qualities that now
you bring into that office. When I was serving -15- months "illegal SHU Term" in
the notorious Corcoran SHU, (the nation's most deadly state prison, according to
the Sacramento, Bee) I've used to listen to you on the radio station (KPFA) and have
written letters to you, and have made some small contribution to that station per
your request.

Despite the some of the changes that you've made in your political views, I am
confident that they're necessary and noble changes for the benefit of the state that
now you so brilliantly and fairly represent. I've my confidence in your brilliance
and in your fairness. I am not writing you just to congratulate you for your success-
ful election into the Office the Attorney General, but not I've a "request" for
your personal investigation of my "American Legal Nightmares" and constant viola-
tions of my law and human rights!

It seems like I've no law rights in this country! No matter what happens to me;
no matter what I've filed, all are simply just gloss-over, rubber-stamped denied!
For example, Deputy Attorney General Ms. Denise A. Yates, dragged me in an out of
state courts for "erroneously" accusing me for failing to exhaust state judicial
remedies, and I had to complied, went back to the state courts, received more "post-
card denial" of my petitions, of the denial of my parole/transfer pursuant to U.S.-
Turkey Prisoner Transfer Treaty, "within -3- minutes" (for God's sake, what kind of
a due process a man can receive within -3- minutes!) she file her second BOGUS
motion to dismiss my petition! Enclosed please find copy of my TRAVERSE dated: Jan.
18, 2007, basically stating that I've no law rights in this country!

Also enclosed are the copies of the letters that I've written to Ms. Yates, and
Deputy Attorney General Mr. James Ching, and Mr. Daniel Kossick, dated: Oct. 19/25,
and Aug. 20, 2006. Your examination of these facts/documents perhaps will give you
better understanding of my legal nightmares in the California criminal justice system.

I've served lot more time than the some of the cold-blooded-dispassionate mur-
derers who have been ordered/granted parole/transfers already. Prior to this tragic
love-story, I've never been in any trouble in my lifetime, and as s result; I've been
very severely punished; learned a very painful lesson, and become a much better per-
son than I've used to be; and I am very deeply, deeply, sorry, sorry, sorry for what
I've done, and its a fact that had I knew than what I know now, this would of never
happened in the first place, but if no one believes all that, that's just fine. Do
the crime, do the time! I've served, finished my time! Especially in comparison to
many individuals have been convicted of much more severe crimes and have served lot
less-time than myself. I'd like you to know that I've survived a "genuine suicide
attempt" at the time of the tragedy, and yet, treated worst than some of the cold-
blooded-dispassionate murderers! Please do what's right and good, and please release
me, and let me go back home. I look forward to hearing from you. Thank you.

Enclosures.                              Respectfully submitted,
CC: Above noted Court.
    (Without enclosures )              FIKRI BAYRAMOGLU/PETITIONER.

Attorney David K. Sergi
Attorney James Dirks
777 Campus Commons Rd. #200
Sacramento, CA.
*Mail to:* Box 666
Pollock Pines, CA. 95726-0666
530-647-1010
fax: 530-647-1087   e-mail: DCFlaw@pacbell.net

07 March, 2000

Fikri Bayramoglu, C-54604, C240
Box 689
Soledad, CA 93960

Dear Fikri:

Here is the Court's ruling in the SHU case. I'm sorry to report that the Court did not find the SHU conditions severe enough to support your claim. You and I know that is bullshit but there is little we can do with this particular case at this point.

David Sergi and I have lost a lot of money trying to make this case for you. We feel that it is just not practical to keep on fighting. If you wish, you may push on with the case to the Court of Appeals. To preserve your right to do that, we filed a general objection to the Magistrate's ruling. If you hurry you can try to send the Court more specific things you want the District Judge to look at before the ruling becomes final.

Let me know if you want to appeal. If you do, we will file a notice of appeal on your behalf when or if the District Judge upholds the Magistrate's findings.

We feel bad that we could not obtain a better result. You are a good man, Fikri, and deserve a chance to live a decent life.

Take care of yourself,

James Dirks.



**ATTORNEY JAMES DIRKS**
777 CAMPUS COMMONS RD. #200
MAIL TO: BOX 191433
SACRAMENTO, CA 95819-1433
916 979 9432
916 482 8677 (FAX)
E-MAIL: NTF.LAW@MCI2000.COM

09 April, 1999

Fikri Bayramoglu, C-54604, C240
Box 689
Soledad, CA 93960

Dear Fikri:

You did even better than i thought. As Maria Landeros and i were leaving the prison, she remarked that she found you very "charming". Looks like you still have the magic touch with the ladies.

Here is what happens next. The AG will file a motion for summary judgment. Of course, we will oppose it and, in this case, we will probably file the cross motion for summary judgment. That procedure resolves the legal issues one way or the other. If the case survives summary judgment, all that remains are your damages, or how much money can you get for this case.

I will send you copies of all the papers that go back and forth in this procedure. I will also look into the rules on transferring you to Turkey.

Take care of yourself,

James Dirks.



**ATTORNEY JAMES DIRKS**
777 CAMPUS COMMONS RD. #200
MAIL TO: BOX 191433
SACRAMENTO, CA 95819-1433
916 979 9432
916 482 8677 (FAX)
E-MAIL: NTF.LAW@MCI2000.COM

19 April 1999

Fikri Bayramoglu, C-54604, C240
Box 689
Soledad, CA 93960

Dear Fikri:

    As promised, i did some research on what it might take to have you sent back to Turkey to "finish" your sentence. I don't know how serious you are about this, but i have enclosed a summary of the procedure. I see that Turkey does participate in prisoner exchanges.

    I see that California has not been known to participate in the program. But that should not prohibit you from trying. Would you like me to make further inquiries for you?

    This is just a thought. Might you be willing to trade this illegal SHU case for California's agreement to permit you to go home? That might be a good bargaining point.

    Let me know your thoughts on this idea.

Respectfully,

James Dirks.

Attorney David K. Sergi
Attorney James Dirks
777 Campus Commons Rd. #200
Sacramento, CA.
*Mail to:* Box 666
Pollock Pines, CA. 95726-0666
530-647-1010
fax: 530-647-1087   e-mail: NCFlaw@pacbell.net

19 April, 2000

Fikri Bayramoglu, C-54604, C240
Box 689
Soledad, CA  93960

Dear Fikri:

Surprise! The District Judge refused to uphold the Magistrate's recommendation dismissing your SHU case. Here is a copy of the Order. You see, the thing we must focus on is the physical effect of your SHU confinement. We have a pretrial conference on 30 May at 14:30. I am not sure at this point if you will be allowed to attend. I hope so. If you are there you can meet the trial lawyer, David Sergi. At the conference we will try to settle the case or proceed to trial.

We must be prepared for trial by 30 May. Between now and then we must work closely together to assemble any evidence we have to present. Do you have any documents to support your claim of physical deprivation and injury during your SHU time? If you do, please send it to David's office.

For preparation of your trial you will be working with Randy Randolph ( a woman). If you don't have it, here is the address and phone.

Attorney David Sergi
attn: Randy Randolph
109 E. Hopkins St. #200
San Marcos, TX  78666
512-392-5038.

Please help us by thinking about the physical deprivation and injuries you experience. We need as much detail as possible, including dates, witnesses and anything else you can come up with. Please put aside your other legal projects for now and concentrate on this. Also think about what you might accept as compensation if the State gets serious about settlement.

Take care of yourself,

James Dirks.



Attorney David K. Sergi
Attorney James Dirks
777 Campus Commons Rd. #200
Sacramento, CA.
Mail to: Box 666
Pollock Pines, CA. 95726-0666
530-647-1010
fax: 530-647-1087  e-mail: NTFlaw@pacbell.net

24 May, 2000

Fikri Bayramoglu, C-54604, C240
Box 689
Soledad, CA. 93960

Dear Fikri:

    Enclosed is the latest order from the Court. somehow we have to get the Court to recognized the proper Defendants or the case will die. We must respond by 2 June. If you have anything to offer on this problem, please let me know soon. Your insights will be helpful. I have also enclosed a stipulation between David Sergi and the Deputy A-G to postpone the pretrial for reasons stated in the document.

    Fikri, you are a good man, a learned man, but a real pain in the butt. We appreciate the fact that your legal projects are very important to you. You seem not to appreciate that we have many clients also with very serious cases. We do not have the time or energy to service your every request. As the lawyers we will manage the case and papers and try to keep you up-to-date. If this situation is unacceptable you have an alternative as I will explain.

    You are probably not aware that it is highly improper and technically illegal for you to be submitting your own papers to the Court since you are represented by counsel. It reflects badly on you before the Judge. It makes your lawyers look bad for not having "client control".

    If you are unhappy with the way this case is going, David Sergi and I invite you to dismiss us and take the case yourself. I have enclosed a substitution of counsel form if that is your desire. Please date and sign it, return it to me and I will file it with the Court. The Judge may or may not approve it. If he does, I will send you your entire file. The file is yours and you are entitled to it when you dismiss us. Please make a decision on this as soon as possible.

                                                    Regards,

                                                    James Dirks.

## ATTORNEY- CLIENT "CONFIDENTIAL"

Fikri Bayramoğlu
CTF-CENTRAL-ZW-205L
P.O. BOX 689
SOLEDAD, CA 93960-0689

24/12/2004

Dear Mr.Bayramoğlu,

I had appointment with our Prime Minister's Counsellor Bahaeddin Cebeci and Atilla Sunay and told the whole story both of them. They helped me very much and they are interested in your case. I applied to the GNA Human Rights Commission and provided a set of your file to them. I also contacted with authorized personnel in Foreign Relations Ministry they all learned your tragic story. In order to help you in States, they told me that they have contacted to the Los Angeles Consulate. I wish I can give the details but as all the letters of mine are being opened I consider not to write the results but they were all positive. I will send the commitment and a job offer as soon as I received the official translations. A copy for you and originals to BPT/CDC.

Annexed please find the list of free legal service providers. I found out this list on internet. I couldn't find a lawyer to represent indigent inmate in California but I am searching with my friends. Enclosed please find the attorney list working with the New York Consulate. I don't know if it helps. I try to provide you attorney lists as much as I can to help you for those stolen lawsuits.

I know you are living in limited conditions and I wish I can do something to change that. I am taking care of everything in Turkey side. I read in your file that you learn shoe cobbling in Prison. I am also trying to arrange a job offer from Government for you. To help you to develop realistic transfer plans. Your transfer process is on track. Correspondance are being made. Even if the States gives consent for your transfer, until you got on the plane they can change their mind without giving any reason. I surely beg you to comply with the rules.

I couldn't receive any letter from you after 6.th of December. I worried if you are ok? I hope you are in good health. Take care of yourself and please wait to get the official result. We have a chance and I sticked to this chance to help you.

Attorney Gökçe Su Gülleroğlu

P.S. I am sorry that I couldn't translate the petition of 9 papes and provide it to you as I had an operation. I attached the turkish version in any case.

SU



DEPARTMENT OF INTERNATIONAL RELATIONS AND PROTOCOL

TURKISH GRAND NATIONAL ASSEMBLY

Mr. Fikri Bayramoğlu C-54604
CTF-CENTRAL-ZW-207L
P.O. BOX 689
SOLEDAD, CA 93960-0689
USA

Ankara, 13 November 2003

Dear Mr. Bayramoğlu,

We received your letter and the enclosed documents.

Mr. Bülent Arınç, Speaker of the Grand National Assembly of Turkey has been informed about your situation in the United States.

Please be informed that, upon his instruction, your documents have been transferred to the Ministry of Justice of the Republic of Turkey as well as to the "Examination of Human Rights Committee" of the Grand National Assembly of Turkey.

Sincerely yours,

M. Asım Temizgil
Director
Department of
International Relations and
Protocol



NOV 2 6

Mr. Fikri Bayramoğlu C-54604
CTF-CENTRAL-2W-207L
P.O. BOX 689
SOLEDAD, CA 93960-0689
USA

TÜRKİYE BÜYÜK MİLLET MECLİSİ
DİŞİLİŞKİLER VE PROTOKOL MÜDÜRLÜĞÜ

A.01.0.GNS.0.76 / 1207



## ASSEMBLY OF TURKISH AMERICAN ASSOCIATIONS

Hon. Judge Verna A. Adam
Marin County Superior Court
Judge of the Superior Court
3501 Civic Center Drive
San Rafael, CA 94903

March 21, 2003

Dear Judge Verna A. Adam,

ATAA (Assembly of Turkish American Associations) is a nonprofit NGO, headquartered in Washington, DC, an umbrella organization for 57 Turkish-American Associations around The United States.

Since inception in 1979, it has been our aim, as stated in our mission statement to improve relations between Turkey and the US, major allies since 1950s, the Korean War, throughout the Cold War, through partnership in NATO, and many others.

Recently, a Turkish citizen currently incarcerated under the California judicial system, Mr. Fikri Bayramoglu has written to me to ask for assistance. Without being too familiar with his case, and the circumstances surrounding his extended jail term, and with all the respect due you, the honorable judge, it is my most sincere desire to ask of you to reconsider his request for transfer to Turkey pursuant to U.S.-Turkey Prisoner Transfer Treaty.

My conversation with Turkish Embassy officials in Washington has also yielded the fact that they are in the process of providing your court with additional information, which you have previously inquired.

This and related matters of law and different interpretations between the two countries have attracted so muck curiosity among our circles that we, as a matter of fact, are planning for a forum in Washington, DC this year in September to be attended by Turkish and American lawmakers. In the end, we are planning to release a white paper to inform all parties involved and for use by law students and the current and future Turkish and American law and policy makers.

It is also my understanding that the Turkish General Assembly is currently evaluating a request by the United States that the American citizens in Turkey, being sentenced for crimes committed in Turkey be transferred to the United States to be sentenced according to the laws here.

Finally, despite Mr. Bayramoglu's assertion that his punishment is unusual due to his ethnic creed or his religion, we as Turkish-Americans would like to state that we have the utmost trust in you, and the most fair judicial system in the world you so honorably represent to be anything but a system of tolerance, impartialness, and high dignity.

Most Sincerely,

Ercument Kilic
President, ATAA

CTF-C-ZW-329-L - P.O. BOX 689
SOLEDAD, CA 93960  USA

Mr. James Davis, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner                    March 5, 2007.
Ms. Janice Eng, Commissioner, Observing
State of California Board of Parole Hearings
1515 "K" Street, Suite 600 - Sacramento, CA 94283

RE: LETTERS FROM THE VICTIM'S SISTERS: MICKEY HARRIS-DAVIS, DANA KAISER-AULOOS
NEPHEW BRANDON HARRIS, TO THE BPH OPPOSING FIKRI BAYRAMOGLU'S "TRANSFER/
DEPORTATOIN" TO HIS HOME COUNTRY TURKEY, AFTER SERVING -27- YEARS FOR HIS
-15-YEARS-TO-LIFE-SENTENCE WITHOUT ANY PRIOR CRIMINAL HISTORY. MARIN CO.
SUPERIOR CRT. NO.: 8215. D.A.'s OFFICE NO.: 3926. OCT. 25, 2006. "TRANSFER/
DEPORTATION" DENIED -4- MORE YEARS. REFUSING TO ATTEND FUTURE HEARINGS.

**Dear Mickey, Dana, and Brandon:**

This is a very difficult letter for me to write. I've nothing to gain, perhaps
a blame. I feel obligated, and sincerely care about all of you, and I'm sure Tracy
would like me to write this letter. **MICKEY:** I'm extremely and very deeply sorry for
what I've done. You've every right to feel the way you feel about me, and I'll never
hold that against you. If you'd allow me to get down to my knees and kiss your feet,
just to make you feel a little better, I'll do it in a second. Try me! You wrote in
part: "Tracy was kind; she was generous." To me Tracy was more than just kind and
generous. She was love, most beautiful; gorgeous young lady, with a "Golden Heart!"
I've live with her almost -2- years, and during that time, not once she talked bad
about anyone, or used any vulgar language. When I've lost her, it felt like I've lost
the piece of my heart! Purpose and meaning of my life. Not that "If I can't have her,
then nobody can." But rather I did not have noting in my life. And please believe me,
on that fateful day, I had tiers in my eyes, and very severe heart-ache in my heart!

In fact, I was examined by half of dozen court appointed psychiatrists, and they
all basically testified that: "...on the day of the shooting, he was so involved with
Tracy, so dependent on her, and he "merged with her." In other words, in shooting her,
he was actually committing suicide, because at that point, he could not tell the dif-
ference between her and himself." Dr. Gudstadt also testified that: "...there was no
question that his psychiatric condition, and his suicide attempt were genuine." In
his opinion, "...the shooting would not have happened had I was not been psychotic
at the time." The physician who treated me in trauma room testified: "...based upon
his experience in treating suicide victims, the nature of my wounds indicated that
this had been a genuine suicide attempt. The knife inflicted a life threatening wound,
and only missed the heart by an half an inch." I wished Tracy was the one who survived,
instead of me. She was full of love, a far more better human being than I can ever be!
She did not deserved to died. She was the "ultimate victim" not me. **MICKEY:** I'm extre-
mely and very deeply SORRY! **DANA:** I think I've met you very briefly once, but I do
not remember when or where. Again, I'm extremely and very deeply sorry for what I've
done, and you've every right to feel the way you feel about me, and I'll never hold
that against you. If you allow me to get down to my knees to kiss your feet, just to
make feel a little better, I'll do it in a second. Try me! **DANA:** I'm extremely and
very deeply SORRY! **BRANDON:** You were just a little beautiful boy when I've met you.
We used to played together. There should be a picture of us, carrying you on my sho-
ulders. You used to called me "Uncle Fiko." I'm sure you've grown up to be a fine
looking young man. Your Aunt Tracy used to say: "He's so cute!" **BRANDON:** I'm extrem-
ely and very deeply SORRY!

Very sincerely,

Fikri
FIKRI

Copies Provided To: Office of the Governor
Marin County Superior Court. D.A.'s Office
Turkish Embassy/Consulate. American Embassy, ANKARA.

---

If writing letters to the BPH causing too much stress and anxiety to this family,
perhaps you do not have to. Because I will continue not to appear before the BPH for
reasons noted in my letter of Aug. 10, 2006. You may request a copy of that letter
from the BPH. I've no law rights before them, or any in the court.

**UNCOMMON LAW**
1300 CLAY STREET, SUITE 600
OAKLAND, CA 94612

KEITH WATTLEY
THOMAS MASTER

January 29, 2007

Fikri Bayramoglu (C-54604)
CTF - CA Training Facility
PO Box 689
Soledad, CA 93960

**Re: Recent Parole Denial.**

Dear Mr. Bayramoglu:

I write in response to the letter you sent our office in December 2006. As I understand your situation, you were recently denied parole for 4 years based primarily on the gravity of the commitment offense, and this was the third time you were denied for 4 years. From your letter, it appears that your offense occurred in 1980 and that you received a sentence of 15 years to life, that you are a Turkish citizen with an INS hold, you have no prior criminal history, and little or no disciplinary history while in prison.

Unfortunately we are a private law firm and are not appointed by the state. If you are interested in hiring our firm to represent you to challenge the Board's decision, please send us the hearing transcript, the Board packet and psych reports, and any other relevant documents. We will take the time to review the documents and will write you again. It is difficult to estimate the cost before reviewing the documents and determining the complexity of your particular case.

If you choose to send us your documents, I would like to know if you have received any letters from the Turkish Government, particularly if they support your release.

Should you have any specific questions, please write our office. Good luck with your appeal.

Regards,

Thomas Master